THE WASHINGTON. THE MARYLAND. THE AUGUSTA.

(District Court, E. D. Virginia. October 20, 1910.)

1. SHIPPING (§ 86*)—INJURY OF MOORED VESSEL BY SWELL—PRESUMPTION OF FAULT.

Where a moored vessel is injured by the swell from a moving vessel, there is not the same presumption of fault against the latter as in case of collision.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 86.*

Liability of vessel for injuries caused by creation of swell, see note to The Asbury Park, 78 C. C. A. 3.]

2. SHIPPING (§ 81*)—INJURY OF VESSEL BY SWELL—NEGLIGENT MOORING.

One of libelant's scows, employed in the dredging of the Elizabeth river in Norfolk Harbor, which had been loaded and moored at one side of the river, where it was lashed alongside another preparatory to their being towed to the dumping grounds, was caused to override the other by the swell from passing steamers and was injured and sunk. Held, on the evidence, that the injury was due to the improper mooring of the scows, and the steamers were not liable therefor, although moving at somewhat excessive speed, and near together on their regular outgoing trip; it not appearing that they were creating any greater swell than should have been anticipated in a busy harbor and provided against.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 345; Dec. Dig. § 81.*]

3. SHIPPING (§ 81*)—MOORING IN HARBOR.

Vessels mooring, or anchoring, especially in a busy harbor, should do so having regard to the fact that others have the right to navigate the waters; and this obligation should be measured by the increased risk arising from the circumstances of the particular case.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 81.*]

In Admiralty. Suit by the Coastwise Dredging Company, as owner of Scow No. 6, against the steamers Washington, Maryland, and Augusta. Decree for respondents.

Floyd Hughes, for libelant.
Loyall, Taylor & White, for the Washington.
Thomas H. Willcox, for the Maryland.
Williams & Tunstall and Foster & Foster, for the Augusta.

WADDILL, District Judge. The libel in this case was filed to recover damages against the three steamships, for injuries alleged to have been sustained by the sinking of one of libelant's scows on the 13th day of July, 1909, in Elizabeth river, near Lambert's Point. The facts are, briefly, these: The libelant company was engaged in dredging on the eastern side of the river, at the point in question, and in such service used the ordinary dredging plant, consisting of barges, scows, etc. When the mud was dug, it was loaded on scows, and then taken to a mooring on the opposite side of the river, and after nightfall the scows were taken down to the dumping ground on Chesapeake Bay, and emptied, and returned for use on the works next day. The custom was to lash two scows together, side by side, at the mooring, and then take them down in tandem; the libelant using a half dozen or more scows at a time. On the evening in question, the libelant had taken to the mooring ground three of the scows loaded, fastened two together as usual, and then placed a third, and shortly before 6 o'clock took over a fourth scow, being Scow No. 6, the one injured, and made it fast to the third scow already moored, making in all four scows then ready to be taken to the dumping ground. About this time the respondent steamers, being regular line steamers between Norfolk and Washington and Baltimore, passed down the channel on their usual daily outward trips. The steamer Washington passed the mooring ground some 1,000 feet ahead of the other two steamers. The Maryland followed, with the Augusta proceeding on the port quarter, and immediately aft of the Maryland. The swell, it seems, from these steamers, caused the scow last anchored, No. 6, to ride up upon and against its companion scow, to which it was lashed, causing her to spring a leak, from which she quickly sank. The libelant's contention is that the damage arose from the rapid rate of speed of the steamers at the time of passing, in contravention of the harbor regulations of the city of Norfolk, and the rules promulgated by the Secretary of War, regarding the speed at which steamers should pass dredging plants engaged in government work. The respondent steamers, on the other hand, deny this allegation, and say that they were navigating within their rights, both as respects the harbor regulations, and the rules prescribed by the Secretary of War, and insist that the injury arose from the unseaworthiness of the scow, and because of its improper and defective mooring. The issue thus presented is the sole question for consideration here, and its determination depends almost entirely upon a correct ascertainment of the facts of the case. An intelligent understanding of just how the scow was sunk will go far in enabling one to reach a proper conclusion of the merits of the controversy.

S. C. Partridge, master of the tug Amanda Moore, formerly in the dredging business, and an employé of the libelant, who took Scow No. 6 over, and made her fast to her companion scow, thus describes the occurrence:

"Q. Now, tell the court what effect their passing at that speed had on the scow. First tell what effect these swells had on your tug boat. A. It made her throw and pitch, but it pitched the scows. One scow jumped on top of the others, sidewise, and lifted the side log up. Q. I wish you would tell the court exactly how that was brought about. A. They lay loaded, perfectly level, about 15 inches out of the water. When one scow went down, the other came up on her with a tremendous swell, and lifted up that place for about 25 or 30 feet, I think. Q. What effect did that have on the scow? A. As soon as she went in again, the water rushed in, a thousand barrels almost, and I discovered the list. Before I could get to her to knock the mud out, she was under water. As soon as she listed a little, the mud stayed there, and she went down. I could not put anybody on her to knock the mud out."

J. W. Moore, the mate of the Amanda Moore, another witness for libelant, gives this version of the sinking:

"Q. Describe to the court what effect the passing steamers had on the scow. A. I think the rolling that they made knocked the two scows together, and the side caught on the other side, and she was rolling, and it raised that some. (By the Court.) Q. You mean that the sea or rolling waves threw the inner scow on the outer scow? A. No, sir; the outside scow onto the inshore scow. Q. Which one was thrown on the other? A. No. 6 was thrown on the other. The outside scow was thrown against the inside scow. There is an eastern scow and a western scow. Q. The eastern scow was thrown on the western? A. Yes, sir. There is a log which extends two or three inches, and that would catch and raise it."

George W. Talbott, a government inspector on the work, introduced in behalf of the steamer, Washington, and who was manifestly not an unfriendly witness for the libelant, on cross-examination says the accident occurred as follows:

"Q. Can you explain to the court how that scow came to sink, or do you know? A. I think the swell struck her; the suction from these two steamers, the Maryland and the Augusta, and perhaps some from the Washington boat too; that caused the scow that was sunk, No. 6, to ride up on the scow which was made fast under the end of the log, and lifted the end of her deck, and, of course, the water went in."

Quite a number of witnesses were examined by the parties respectively, upon the issues presented, and especially as to the speed at which the steamers passed the plant, and whether or not the scows were properly moored, and on each of these questions there is considerable conflict. The court's conclusion is that the evidence sustains the libelant's contention that the speed of the steamers was in excess of that prescribed by the Secretary of War, regarding the passing of dredging plants, and somewhat in excess of that prescribed by the harbor regulations, though nothing like as contended for by the libelant. Whether this rate of speed, however, materially entered into the happening of the accident, is something as to which the court is by no means clear. It is true that the damage done was sustained by swell from the steamers; but that would have occurred with a steamer passing at most any reasonable rate of speed, and was especially true in this instance, when the steamers at the point where complaint is made of their speed were making a departure on their course of two and a half points for the course round Craney Island Lightship. Three steamers thus navigating at the same time, two of them virtually together, necessarily would have caused a considerable swell at any time. They were on their regular schedule runs, and had undoubtedly the right to so pass down the

river; and the libelant was charged with knowledge that they were to be expected at that time, and should have had sufficiently strong scows so moored as to the meet the strain arising from such swell, as well as to protect them from danger caused by fastening them one to the other. Whether these scows were properly moored, having regard to their positions, is the crucial question in this case. The libelant insists that they were; the respondents contend to the contrary—each introducing evidence to support their respective claims. The statement of Capt. Phillips, of the Washington steamer, who had been superintendent of a dredging company, had worked under Col. Haines, Maj. Charles Davis, and Maj. Anderson, of the United States army, on government contracts, succinctly shows this feature of the case. He says on this subject:

"Q. You have heard of the manner in which these scows were moored, two abreast and two tandem? A. Yes, sir; it is not the usual way to moor them, without putting fenders in between them. In the first place, the owners of the scow know when they are moored that way there is a log which comes in on top of the scows, which comes out further than the lower planking, and, when there is any sea wave, they are rubbed up against each other, and that log is liable to be caught and raised up, and, with the weight of these scows, it is almost a matter of impossibility to get them up. But it is not usual to tie them up that way; they generally tie them end on. The greatest difficulty I had was to keep scows from getting tore up, in the least bit of sea wave, in getting to the dumping ground. Sometimes I had to put them 15 or 20 feet apart to keep the scows from coming together."

The conclusion of the court is that these scows were not properly moored; that at that place, one of the very busiest and most congested parts of the harbor of Norfolk, almost immediately opposite the Lambert's Point wharves of the Norfolk & Western Railway Company, and where there is much shipping, and many vessels anchored, they should have anticipated this occurrence. That is to say, if the scows were lashed together, side by side, without fenders or other protection, that the swell from a passing steamer would throw them sideways one on the other, necessarily bringing about the very accident which occurred here; for, the moment that the overlap of one scow would fall upon the other, the upper part, or deck, of the scow raised, would be subject to the entire weight of the scow and load of mud in it, and it would, of course, rip open, fill with water, and sink, as it did here. This could have been provided against, either by mooring the scows separately, or providing fenders, or other means of protection of one scow from damaging the other, none of which would have been expensive; and, if needs be, a different and less exposed mooring ground could have been selected.

The failure of the libelant to exercise due care in these respects was the real cause of the loss complained of, and constituted a distinct fault on its part, within itself sufficient to account for this accident.

With the libelant's negligence thus clearly established, and that being the efficient cause of the accident, there can be no recovery in this case; nor can the libelant by raising doubts as to, or questioning, the management of others lawfully engaged in the navigation of the same waters, compel them to share its burdens. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84.

Counsel for the libelant, in argument, suggests that inasmuch as the scows were moored, and the steamers under way, the latter were presumably at fault in this case. This doctrine, in the judgment of the court, has no application here, as there was no collision between the two sets of vessels. Each was lawfully using the harbor; neither had any right one over the other. The scows were entitled to assume that the steamers would properly navigate the channel, and the steamers that the scows were seaworthy and properly moored. And hence, if damage occurred, either from the unseaworthiness of the scows, or because they were unsafely moored, no unfavorable presumption should arise against the steamers, nor should they be held liable for losses arising from neglect of the libelant. It was the duty of the steamers to exercise due care in their navigation, and to proceed at such a reasonable rate of speed as not to endanger other shipping from their swell; but they had the right to suppose that one in the position of the libelant would exercise proper precaution for its own safety, especially having regard to the scene of this accident. The harbor of Norfolk is a most important one, its business constantly increasing, and the need and necessity of its being kept free and open, with a view of not unduly hindering and impeding the growing demands of commerce therein, is ever apparent, and hence it is not unreasonable to impose upon those mooring or anchoring vessels therein to do so in view of existing conditions. They must not shut their eyes to the fact that ships of all sizes, continually, day and night, pass up and down those waters. This is particularly true at the scene of this accident, which, by reason of the coaling station and other shipments from that place, is almost invariably congested, and the channel in that vicinity should be as little obstructed as possible, and least of all should there be anything approaching insecure or unsafe mooring or anchorage.

Another feature of this case worthy of consideration, though not necessary to be passed upon in the view taken by the court, is, assuming the steamers in question to have been guilty of some fault which may have contributed to the accident, still it would be extremely difficult, if not impossible, to determine from the evidence which one or more of the steamers should bear the blame, or how the proportions of the damage resulting from such fault, as between them, should be arrived at. The Washington steamer was quite a distance ahead of the other two, and of those one slightly ahead of the other. Whether the swell from the first steamer caused the scow to sink, or that from the last two, or from the three combined, is next to impossible to determine.

The loss to the libelant having resulted from its own negligence, as stated, it follows that a decree should be entered dismissing the libel at its cost.