## THE PRISCILLA.

(District Court, S. D. New York. May 20, 1926.)

**1. Shipping ⬥⇒86(2).**

Evidence *held* to warrant decree against vessel whose swells were alleged to have caused cars of coal to roll from float in slip.

**2. Shipping ⬥⇒86(2).**

Where float being moved into slip was damaged by passing vessel, latter is presumed to be at fault.

In Admiralty. Libel by the Brooklyn Eastern District Terminal, as bailee of four coal cars and contents laden on the Brooklyn Eastern District Terminal Float No. 5, against the steamship Priscilla; the New England Steamship Company, claimant. Decree for libelant.

Bigham, Englar & Jones, of New York City (Andrew J. McElhinney, of New York City, of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for claimant.

KNOX, District Judge. At about 7 o'clock on the morning of July 31, 1920, the Invincible was in the process of landing car float No. 5 of the Brooklyn Eastern District Terminal at the south side of the pier, at the foot of North Fifth street, Brooklyn. The tide was flood, weather clear, and there was no wind. The float was loaded with ten gondola cars, filled with coal. Six of them were on the port track, and four on the starboard.

The brakes of the cars are said to have been tightly set, and the wheels were blocked and chocked with wooden or iron chocks placed in front of each of the forward wheels of the forward truck of the first car. Similar chocks were placed in the front of the wheels of the last car of each string. In addition, the cars were fastened by a chain composed of iron links one inch in diameter, which ran from the drawhead of the forward car to an anchor bolted to the deck of the float.

The Invincible, with the float in tow, went to the place of the accident from Jersey City. Upon arrival at the pier, the tug rounded to, landing the float at the water end of the dock, bow down the stream. The tug got under the float's stern, took a tow line from her second cleat on the starboard side, and pushed her, bow first, into the slip, the bow angling along the southerly side of the pier.

While thus engaged, the Priscilla, unobserved by the Invincible, came down the river some 200 or 300 feet off the pier ends. Her speed is variously estimated. Some of the testimony puts it as high as 15 knots. The witnesses from the steamer do not remember the occurrences of the morning in question, except as their memories are refreshed from entries on the log. Considering the time it took the Priscilla to cover the distance between Hell Gate and Pier 14, on the North River, it is apparent that she was traveling at the average rate of at least 10 miles an hour. Aside from the time element, the log shows that, in passing through the East River, the Priscilla ran slowly, and that she stopped for diggers, drillers, and barges. In this connection, it should be noted that a driller was anchored in the East River, about 300 feet off the pier at the foot of Tenth street, Manhattan, and almost directly opposite to the pier at North Fifth street, on the Brooklyn side.

While the tug and the float were in the position heretofore indicated, and about two-thirds of the way up the slip, it is said that a heavy swell of water, thrown by the Priscilla, swept against them, lifting up the float's stern, breaking the 5½-inch line that ran to the tug, and causing the barge to surge against the dock. For a moment it was feared that the stern of the barge, upon the passing of the swell, would strike against and crush the bow of the tug. This possibility was averted by backing the tug away. The first swell was followed by another, which again lifted up the float and caused it to strike the dock. At this impact, the four cars on the starboard track of the float began to slide along the rails. A futile effort was made to stop their progress. The wheels began to turn, the cars gained momentum, and in an instant more went over the bow of the float into the river. The cars on the other track moved somewhat, but not so as to cause damage.

The master of the tug estimates that the swell was about 5 feet in height. In any event, he says, it was sufficiently high to roll over the deck of the tug after striking the float.

[1] In answer to the testimony on behalf of the libelant as to the size of the swell thrown by the Priscilla, the claimant called a witness who recently went to the pier to observe the steamers' swells as they reached the dock. As the boat went by on this occasion en route to Fall River, she was a little to the east of the middle line of the water between the pier head and a buoy on the edge of Shell Reef. I estimate the buoy to be about 600 feet from the pier end. It is probable, therefore, the Priscilla was about 275 feet off the pier. The witness estimates she was moving at the rate of 12 knots and the tide was against her. When

her first swell reached the pier head, the water fell away about 4 inches, and as the crest of the wave came along it rose 14 inches. It was followed by several waves of lesser height. The effect upon two car floats made fast to the bridge within the slip was to give them a gentle roll. Pitching. was so negligible that it could not be estimated in inches.

During the period covered by the observation of the witness, several other vessels, smaller than the Priscilla, went by. The swells of one of them caused a car float made fast to the north side of the pier, and not toggled to the pier head, to surge out into the slip to the extent permitted by her lines, and then to surge back against the fender piles of the pier. This movement, however, was not accompanied by either pitching or rolling. The witness concluded that no swells from the Priscilla or any other boat would cause the car float, loaded as was the one in question, to be lifted to a distance of 5 feet. With this I agree.

Nevertheless the accident occurred, and it did so when the float was being handled in the usual manner by an experienced tug captain and crew. It has been shown by undisputed testimony that the cars on the float were firmly secured and fastened. In addition to the tug captain, several witnesses of the accident, who are not now employed by libelant, testify that the swells of the Priscilla on the morning in question were of unusual height, and that they caused the float to toss and pitch, so as to cause the dumping of the cars. Aside from the fact that these witnesses probably overestimated the height of the swells, as measured in feet, there is no reason to discredit their version of the occurrence. When considered in conjunction with the fact that the float was in the slip, being gently pushed toward the bridge, and that there is nothing other than the swells of the Priscilla to account for what happened, the testimony should entitle the libelant to a decree.

[2] In the Rotherfield (D. C.) 123 F. 461, it was said that, "where a vessel properly moored at a dock, at anchor, or not in motion, is damaged by a vessel in motion, the presumption of law is that it was the fault of the one under way, and it is presumptively liable until the contrary is shown, the burden of doing which is upon the vessel under way." I think the situation of the float was such as to bring her within the rule just quoted. If so, claimant has not discharged the obligation resting upon it.

Aside from the log entries, it is unable to throw any light on what occurred on the morning of the accident, notwithstanding it was notified of its occurrence by a letter written on the same day. In reply to that communication, claimant said that it would "investigate the matter with the crew of the steamer." If such an investigation was had, it did not result in enabling the Priscilla's responsible officers to tell much of the trip through the East River on the morning of the accident.

I think it likely that the Priscilla, as she came down the river on the morning of the accident, kept rather close to the Brooklyn shore, and, if she stopped her engines in passing the dredge anchored to the westward, she probably started them again while she was close by the float. In doing so, it is probable that she threw the swells which caused the damage.

Libelant may have a decree.