### LADD v. UNITED STATES.
### THE ELOISE.
### THE MOHICAN.
#### No. 7398.

United States District Court
E. D. Virginia, Norfolk Division.
April 9, 1951.

---

4. The language was used in construing another portion of the Act.

Hugh S. Meredith (Vandeventer & Black), Norfolk, Va., for plaintiff.

John P. Harper, Asst. U. S. Dist. Atty., Norfolk, Va., George R. Humrickhouse, U. S. Dist. Atty., Richmond, Va., for defendant.

BRYAN, District Judge.

Under the Public Vessels Act, 46 U.S. C.A. § 781, recovery is asked of the United States for damage to the sloop Eloise when a Coast Guard cutter, the libelant says, by her wash caused his vessel to lose her mast on the Elizabeth River, Virginia, near Buoy 25 and not far above the merchandise docks of the Norfolk and Western Railroad.

The sloop was on her starboard side of the middle of the channel, bent downstream, i. e. northwardly. Her owner charges that the cutter Mohican, bound upstream and taking a course just to starboard of mid-channel, was throwing a wake so great that it caused the Eloise to roll and to wallow in the swell with such violence as to snap her mast. Negligence is also laid to the cutter in that she failed to keep a proper lookout, not alert to the distress signals from the Eloise; that she was offensively near the middle of the stream; and that she did not defer to the rights of the sailing vessel.

The Eloise is approximately 54 feet in length with a 70-foot mast forward. About noon on July 23, 1950, she had put out on a shake-down trial run; it was her first day on the river since the preceding winter. According to the libelant, her mast had recently been scraped, sanded and oiled, and was in good repair and sound condition throughout. The ship had been readied for use on fishing and other pleasure trips. The mast was 14 inches in diameter and octagonal in shape as it passed through the deck. Aboard the Eloise were the libelant Ladd, one Conklin and his brother, and another by the name of Battern.

The libelant testifies that the Eloise was becalmed as she came under the lee of the N. & W. R. R. piers; that she thereby lost steerageway and lay immobile, her sails flapping listlessly; and that she was then halfway between the middle of the channel and the shore, headed inshore at an angle of 45 degrees with the center line of the channel. In this situation, those aboard the Eloise say, they saw the Mohican rounding Lambert's Point, almost a mile downstream; that as she neared them, fearing her swell, one of the crew members of the Eloise blew distress signals on the mouth foghorn, and two of them ran out upon the bowsprit and waved to the Mohican, but their signals went unheeded; and that the Mohican passed within 50 yards at a speed of 12 knots. The libelant, who was in charge of the Eloise, states that the rollers quartering from the cutter were 5

feet in height from trough to tip, and striking his vessel broadside while she lay parallel to them, caused her to careen severely to starboard; that, as she recovered, she was struck a second time by a close-following or "artificial" wave, her return abruptly broken, and her hull again heeled far over to starboard; and that her mast, as it swung upward from the first list was so forcefully flexed and snapped by the second blow that it broke at deck level and fell over the port side. The cutter came about and towed the Eloise to a nearby pier.

The Mohican is a cutter or tug of 110 feet in length with a beam of 26.5 feet and a depth of 15 feet. She is powered by two diesel electric engines. Her master testified that he was in the wheel house and at the wheel; that he was accompanied by one Willette, acting as lookout; and that they both saw the Eloise, but heard or observed no signal of any kind. The master and Willette stated that her engines were then turning over at the rate of 165 r. p. m., which would develop a speed of not more than 8.5 knots. The master further said that when he saw the Eloise she was under way but heeled over to port by the offshore flaws of wind. He says there was no excessive speed in his vessel, nor was the wake anything more than a slight disturbance.

It is uncontroverted that the day was clear, the wind light, variable and "fluky".

Besides denying the allegations of negligence, the United States charges that the mast of the Eloise was unsound, being deteriorated at the point of the break to a horizontal depth of two to three inches from its circumference. A survey party went aboard the Eloise three days after the accident and took wood samples of the mast, but at that time the only part of the mast available was the butt left below deck.

While admitting a deterioration in the periphery of the mast, the libelant contends that it was only in the sapwood and not at any point in the heartwood of the mast, arguing that the strength of the mast was therefore not affected. Against this an expert, an officer of the Coast Guard whose qualifications were proved, explained that there is the same strength in sapwood as in heartwood; that the only difference is that the heartwood is not as readily subject to deterioration as is the sapwood; and that the sapwood adds greatly to, and indeed is the main reliance of, the bending power of wood. He further said that the removal of the sapwood, or of any part of the mast, to the extent of 10 per cent of its diameter, would reduce the strength of the mast to 70 per cent of its former strength; a decrease of 20 per cent in diameter would reduce the strength to 50 per cent; while a decrease of 30 per cent in diameter would effect a reduction to 34 per cent of its former strength.

The libelant points to the evidence that the sloop had well met the strenuous tests imposed upon her in the oyster-dredging trade to which she had been devoted for the four or five years just preceding the collision and in which the mast is used for raising and hauling the oysters aboard. He refers also to her demonstrated ability in the past to withstand, when running or reaching, greater seas than those thrown by the cutter, as well as to the diligence expended in her care, maintenance and repair.

On the other hand, the United States argues with equal force that the swell was no more than was to be expected by the sloop, and that the breaking of the mast conclusively proves her unseaworthiness. The United States also urges that even if the cutter was proceeding at 12 knots, it was not an excessive speed for the harbor, and no more than every sailing vessel is expected to meet there. Her counsel adverts to the machinery logs to sustain the testimony of her master and lookout, that the cutter's propeller was not turning over at a greater rate than 165 r. p. m.

At the request of the United States, the Court with counsel boarded the cutter on the day of the trial and watched her wake at the very point in question and under the speed contended for by each party. Observation from the shore was also made of her wake. It is agreed that at 165 r. p. m. the swell in the wake was unappreciable.

At 235 or 240—the maximum of her engines—the swell was sizeable, not 5 feet but certainly 3 or 4.

 The conclusion of the Court is that whatever the speed of the Mohican, it was too fast against the obvious plight of the Eloise and the cutter's proximity.

The bald fact is that her disturbance snapped the mast of the Eloise. It was great enough to wash the forward deck of the sloop, over a freeboard of 6½ feet. All of this supports the Eloise—that the cutter's passage was at 50–55 yards of the sailing vessel and that her speed, measured by the extent of her wake and the proximity and the circumstances of the smaller vessel, was menacing. If the Mohican saw the Eloise and her parlous state, and did not reduce her speed or give her a wider berth, she was negligent; if she failed to observe the sloop, or recognize her peril, she was likewise negligent.

That the mast was carried away by the sudden and repeated impact of the swells cannot be gainsaid. This prima facie makes the case for the libelant. The Majestic, 2 Cir., 48 F. 730; The Chester W. Chapin, D.C., 155 F. 854; The Priscilla, D.C., 15 F.2d 455. The Mohican has not exonerated herself, and she must. The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, and cases supra. The mast may have been weakened but it was not weak. Just a few hours previous it had borne the weight of a crewman climbing to the masthead to adjust the rigging. Its stays and shrouds were firmly and amply bracing it, but not too tautly. The sails were not filled and there was no strain on the mast to cause it to go overside save the wallowing of the hull. In size the mast was more than required. Deterioration there was, but not enough to answer for the break. The expert testimony was earnest, interesting and intelligent, but necessarily hypothetical, and as such too abstract to control here. In sum, the Eloise was not unseaworthy or at least she is not proved to have been so.

The Washington (The Maryland, The Augusta), D.C., 182 F. 885 does not induce a different decision. There Judge Waddill, in this court, found the accounting fault to be the mode of mooring the damaged barges. No apposite fault is attributed to the Eloise.

For damages to the sloop judgment will go for the libelant in the sum of $2,000 with costs. His proctor will present an appropriate decree, after submission to the United States Attorney for consideration of its form. This memorandum is adopted by the Court as its findings of fact and conclusions of law.