**CREOLE SHIPPING LTD., a corporation, Plaintiff,**

v.

**DIAMANDIS PATERAS, LTD., a corporation, and the M/V PANAGOS D. PATERAS, etc., et al., Defendants.**

**Civ. A. No. 75–87–T.**

United States District Court, S. D. Alabama, S. D.

April 8, 1976.

David A. Bagwell, Mobile, Ala., for plaintiff.

Sidney H. Schell, Mobile, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on the 2nd day of February 1976. After hearing the evidence, examining the exhibits, the pleadings, the stipulations and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff Creole Shipping, Ltd., owner of the M/V PYRAMID VETERAN (PYRAMID VETERAN), brought suit alleging that on February 8, 1975, the M/V PANAGOS D. PATERAS (PATERAS) while being operated under its own power up the Mobile River, passed the PYRAMID VETERAN and that the hydraulic suction effect of the defendant vessel caused the PYRAMID VETERAN to surge fore and aft and out into the channel. The plaintiff asserts that the PYRAMID VETERAN was securely docked alongside Pier C, river end, of the Alabama State Docks. The plaintiff further asserts that the PATERAS was negligently operated at an excessive speed and as a proximate result of the defendants' negligent conduct the port gangway, the forward springline, the aft springline and other appurtenances of the PYRAMID VETERAN were thereby damaged. In reply, the defendants denied the material allegations of the complaint that they were negligent. Moreover, the defendants plead contributory negligence asserting that the plaintiff was itself negligent in maintaining the PYRAMID VETERAN'S lines in a slack condition while the vessel was moored.

2. The plaintiff, Creole Shipping, Ltd., is a corporation organized under the laws of the Bahamas, and at all pertinent times herein was the owner of the PYRAMID VETERAN.

3. The vessel PATERAS was at all pertinent times owned by the defendant Diamandis Pateras, Ltd., a corporation, and operated by the defendant Diamond Freighters Corporation.

4. It is stipulated by both parties that the PYRAMID VETERAN arrived in the Port of Mobile on February 6, 1975. (Pl. Ex. 18)[1] Upon arrival the PYRAMID VETERAN, laden with a cargo of Manganese slag, was moored at the river end of Pier C to await an unloading berth at the Alabama State Docks bulk handling facility.

5. Although the records of the office of the Harbormaster of the Port of Mobile reflect that the PYRAMID VETERAN arrived on February 6, 1975, no damage was effected to the PYRAMID VETERAN by the passage of any vessel during that period, except the damages alleged to have been caused by the PATERAS on February 8, 1975.

6. On the date of the alleged accident, the PYRAMID VETERAN was the only ship moored on the river end of the Alabama State Docks. (Pl. Ex. 18)

7. At approximately 0700 hours, the vessel PATERAS, which was proceeding upriver against the current, passed the PYRAMID VETERAN thereby causing the alleged damages to the plaintiff's vessel. (Pl. Ex. 14)

8. The PATERAS is a large vessel measuring some 593 feet in length and at the time of her passage up the Mobile River was fully loaded with manganese

---

1. References preceded by "Pl. Ex." or "Def. Ex." are to the exhibits admitted into evidence during the trial on behalf of the plaintiff or defendants respectively.

ore and was drawing forward 35 feet and 36 feet aft respectively. (Pl. Ex. 17)

9. As the PATERAS was proceeding upriver she was under her own power; however, she was being assisted by two harbor tugs, the M/V CATHLEEN MORAN and the M/V BARTON GREER.

10. Pilotage is compulsory in the Port of Mobile and in the instant case the bar pilot of the PATERAS was Capt. W. P. Adams. (Def. Ex. 5) At the time of the incident Captain Adams was a member of the Mobile Bar Pilot's Association for some twenty-one years having received his Master's License in 1940.

11. Captain Adams testified that the depth of the Mobile River where the PATERAS passed the PYRAMID VETERAN is forty (40) feet and that the suction effect of passing vessels in the river is strongest on vessels moored on the river end.

12. Due to the presence of a barge fleeting area on the East bank, inbound ships must proceed slightly to the West of the centerline of the river, or closer to any vessels moored on the river end of Pier C. It is undisputed that the PYRAMID VETERAN was moored on the West side on the river end of Pier C.

13. The plaintiff asserts that as the PATERAS passed, the suction or hydraulic effect of her passing caused the PYRAMID VETERAN to surge fore and aft thereby causing damage to her port gangway and lines. In support of its position, the plaintiff offered the testimony of Bernardo Fernandez Cano. Cano, a Spanish seaman with 48 years experience, was chief mate aboard the PYRAMID VETERAN and on the morning of February 8, 1975, Cano testified that he went on watch at 0400 hours. The chief mate further testified that he checked the vessel's moorings at 0400 and again at 0600, and in his opinion the vessel was properly moored.

■ 14. According to Cano, when the PATERAS passed the PYRAMID VETERAN at approximately 0700, it became apparent to him that the PATERAS was traveling at an excessive speed under the circumstances and that damage to the PYRAMID VETERAN was imminent. Moreover, Cano testified that as the PATERAS passed, the PYRAMID VETERAN surged fore and aft and opened a distance between the dock and the ship of approximately four meters (13.12 feet). Finally, the chief mate testified that the velocity of the propeller on the defendant vessel caused the accident. In reply, the defendants assert that the PATERAS was being operated in a proper manner. Captain Adams testified that the PATERAS was being operated at slow and dead slow speed at approximately three to four miles per hour. The pilot testified at trial that he found it necessary from time to time to "kick ahead" the PATERAS so as to maintain steerageway. Admittedly, such a "kick ahead" would increase the speed of the PATERAS to some degree which would increase the suction effect, and this Court so finds. However, based on the credible evidence, the Court is of the opinion that the PATERAS was in fact moving only at such speed as to maintain steerageway and therefore was not operating at an excessive speed.

■ 15. Although the defendant vessel was in fact moving at a speed sufficient to maintain steerageway, that fact does not necessarily absolve a moving vessel from negligence. In the instant case, the PATERAS was heavily ladened and was proceeding through a narrow channel. The river depth necessitated a close approach to the PYRAMID VETERAN moored at the river end of Pier C. Captain Adams testified that when a large heavily laden ship such as the PATERAS traverses the Mobile River there is some suction effect due to the displacement of water. Under these circumstances there may well be a duty upon a moving vessel to proceed under the vessel's own power below steerageway speed, relying upon tugs to provide all steering rather than merely providing steering assistance. Moreover, the bar pilot testified that the mooring lines on the PYRAMID VETERAN were slack.

Assuming *arguendo* that the lines of the PYRAMID VETERAN were slack as alleged by the defendants, would then such a condition serve as a red flag to an experienced bar pilot on a moving vessel that a potentially dangerous condition exists. There can be no doubt that mooring lines must be sufficient in both number and placement and carefully checked in order to prevent or minimize the suction effect of passing vessels from causing excessive motion and damage to moored vessels. In the case at bar, such factors as a heavily-laden large moving vessel, a narrow channel, a bottleneck necessitating a close approach to the bank, a vessel at river end coupled with the alleged factor of slack mooring lines can only maximize the potential suction effect. Accordingly, the Court finds that the defendants were negligent on the date in question, and that such negligent operation was a substantial factor in causing harm to the plaintiff's vessel, lines and port gangway.

16. The defendants assert that the plaintiff was itself negligent in allowing the PYRAMID VETERAN to lie along the river end of the dock with slack mooring lines. In support of the defense of contributory negligence, the defendants offered the testimony of Captain Adams who stated that he specifically recalled the lines aboard the PYRAMID VETERAN being slack on the date in question. The plaintiff contends that the credence to be given the bar pilot's recollection as to the tautness of the lines on the PYRAMID VETERAN should be significantly reduced in that Captain Adams testified at trial that when his deposition had been taken on November 14, 1975, he did not even recall being the pilot aboard the PATERAS on February 8, 1975. Moreover, the pilot's recollection as to the direction in which the PYRAMID VETERAN was lying, and whether she was laden or light, was contrary to the weight of the evidence and testimony of other parties.

17. In rebuttal on the contributory negligence issue, the plaintiff presented the testimony of William H. Gifford, the Marine Engineering Manager of the PYRAMID VETERAN'S managers, who testified that on the two days prior to the morning of this accident, he had noticed that the PYRAMID VETERAN'S lines were taut. As previously stated, chief mate Cano testified that at both 0400 and 0600, just prior to the accident at 0700, he checked the moorings lines of the vessel.

18. Additionally, several ships passed the PYRAMID VETERAN'S position on February 6, one on February 7, and one besides the PATERAS passed the plaintiff's vessel during chief mate Cano's watch on February 8, 1975. The testimony in this case reflects, and the Court so finds, that no damage was caused to the PYRAMID VETERAN by those passing vessels.

19. In order to determine whether the PYRAMID VETERAN was improperly moored it is necessary to find that the vessel's lines were either slack or that there was an insufficient number of lines to overcome the suction effect of the PATERAS. The PYRAMID VETERAN was moored by the use of five breast lines forward and the same number aft, and also two springlines, one forward and one aft. (Pl. Ex. 15) There was no forward breast line, however, because there was no bollard in place on the dock to receive such a line. (Def. Ex. 2) According to the testimony of Cano the breast line is to prevent the moored vessel from moving away from the dock while the springlines are used to prevent fore and aft movement. Cano further testified that "springlines are the keys to the mooring of the ship." Although the chief mate stated that the vessel was correctly moored for normal conditions he did concede that the vessel would have been better moored with two springlines forward and aft. In his deposition testimony Cano stated that in many ports the practice of doubling the springs, meaning two on the bow and two on the stern is the general practice. Notwithstanding the testimony as to the tautness of the lines when the PATERAS passed the PYRAMID VETERAN

the plaintiff's vessel surged four meters from the dock parting her forward and aft springlines. (Pl. Ex. 16) There can be no dispute but that the PATERAS in passing the PYRAMID VETERAN caused the vessel to surge from the dock; however, the distance that the plaintiff's vessel surged into the channel and the manner in which the lines parted raises a serious question as to the tautness of the mooring lines. Based on the credible evidence, the Court is of the opinion that the mooring lines on the PYRAMID VETERAN at the time of the passing of the PATERAS were slack. Accordingly, the Court finds that the plaintiff was negligent with respect to the mooring of the vessel and therefore damages should be reduced proportionately under the doctrine of comparative negligence.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter based upon its admiralty and maritime jurisdiction 28 U.S.C. § 1333(1) in that this cause involves an alleged tort committed upon the navigable waters of the United States involving a subject matter with maritime nexus. *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).

2. This is a suction damage case. The rules of law involving suction or swell damages have been summarized as follows:

> "A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suction which would damage craft properly moored or installations along the shoreline. . . . (Citations). The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage. . . ." (Citations)

> "On the other hand piers and docks along the shoreline are required to be kept in proper condition and vessels tied up there must be seaworthy and properly moored so as to resist ordinary and normal swells in narrow waters where heavy traffic may be anticipated. Some wash from passing vessels is bound to occur and must be anticipated and guarded against. Only unusual swells or suction which cannot be reasonably anticipated furnish the basis for a claim. . . ." (Citations)

> "Once libelant has established that swells or suction caused damage to its craft tied up at the shoreline, that such craft was properly moored to resist ordinary swell and suction normally to be anticipated, and that the swells came from the passing vessel charged with liability, the vessel which caused the swell is then required to exonerate itself from blame. In order to avoid liability she must show that it was not in her power to prevent the injury by any practical precautions she could have adopted." *O'Donnell Transportation Co. v. M/V Maryland Trader,* 228 F.Supp. 903, 909 (S.D.N.Y. 1963).

3. In cases where the hydraulic suction, wake or wheelwash of a passing ship damages another ship, the proof of the fact of injury to the stationary vessel by the water movement from a passing vessel makes a *prima facie* case and raises a presumption of fault: "the presumption of law is that it was the fault of the one under way." *The Priscilla,* 15 F.2d 455, 456 (S.D.N.Y.1926). The United States Court of Appeals for the Fifth Circuit has stated:

> The fact of injury to the (docked vessel) from swells *prima facie* establishes the liability of the (moving vessel). And since she was the moving vessel, she must exonerate herself from blame by showing that it was not in her power to prevent the injury by adopting any practical precautions. . . .

*West India Fruit & Steamship Co. v. Raymond,* 190 F.2d 673, 674–75 (5th Cir. 1951). *Accord, Dufrene v. The Tug Diversity,* 163 F.Supp. 331 (E.D.La.1958), *aff'd,* 272 F.2d 880 (5th Cir. 1959); See J. Griffin, The American Law of Collision §§ 257, 259 (1949). In the instant case, proof of damage resulting to the PYRAMID VETERAN, the stationary vessel, caused by the PATERAS, the moving vessel, raises a rebuttable presumption of fault by the PATERAS. Having considered the testimony the Court finds that the defendants were negligent on the date in question, and that the negligent operation of the PATERAS proximately caused damage to the plaintiff's vessel, her lines and port gangway. (See Finding 15)

▮ 4. The defendants assert that the plaintiff was itself negligent in that the plaintiff's vessel was improperly moored. The Court is of the opinion that the defendants have proved by a fair preponderance of the credible evidence that the plaintiff was negligent with respect to the mooring of its vessel. (See Finding 19) However, the issue of the plaintiff's own negligence is to be determined only in terms of reduction of damages under the proportional fault holding of the United States Supreme Court in *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Under the decisional law in the Fifth Circuit, so long as the defendant's negligence is a "substantial factor in bringing about the harm," an independent intervening cause will not relieve the defendant from liability. *Spinks v. Chevron Oil Company,* 507 F.2d 216, 223 (5th Cir. 1975); *Watz v. Zapata Off-Shore Co.,* 431 F.2d 100, 116 (5th Cir. 1970). Accordingly, the plaintiff's negligence will reduce its damages proportionately under the mandate of the *Reliable Transfer* rule.

▮ 5. In order to assign the percentage of liability between the PATER-

AS and the PYRAMID VETERAN the Court must determine what damages are to be apportioned. The plaintiff claims damages to the port gangplank in the amount of $2,796.00. Plaintiff asserts that the port gangplank had been completely repaired in Dunkirk, France, only one and one-half months prior to this accident. (Pl. Ex. 21) Plaintiff further asserts that due to the defendants' negligence, the port gangplank aboard the PYRAMID VETERAN was twisted and bent so that it was necessary to have stanchions replaced, to have a new turntable fabricated, and to have various spots rewelded and joined. (Pl. Ex. 1–13, 19, 20) The Court finds that necessary repairs effected by Bender Welding and Machine Co., Inc. to be a reasonable charge and therefore, this item of damage is to be allowed in the amount of $2,796.00.[2]

▮ 6. The plaintiff claims damages for two springlines that parted aboard the PYRAMID VETERAN as a consequence of the defendants' negligence. (Pl. Ex. 16) The plaintiff purchased two replacement coils at the value of $5,468.54. (Pl. Ex. 22) However, the parted springlines were re-spliced and according to the testimony of C. L. Hamilton, a marine surveyor, the lines were found to have a useful life expectancy of about three years since the new line was replacing line which was approximately one year old. Therefore, under these circumstances a "new for old" allowance is appropriate. *Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300 (5th Cir. 1976). In applying the "new for old" allowance the cost of replacement should be reduced by a fraction of which the useful life extension is the numerator, and the remaining useful life after repairs is the denominator. Therefore, in the instant case, the one-year-old line when replaced has a useful life of three more years and is calculated as follows: ⅓ x $5,468.54 = $1,822.85. Accordingly,

---

**2.** Since the gangway had just been repaired and refurbished, any "new for old problem" with respect to the gangway would be *de min-* *imis.* Therefore, this item of damages is allowed in its entirety.

the amount of recoverable damage for the line, and this Court so finds, is $5,468.54 less $1,822.85 or $3,645.69.

 7. Finally, the plaintiff claims damages in the amount of $625.00 for the two and one-half days that William H. Gifford, Engineering Manager of the PYRAMID VETERAN'S managers spent in supervising and arranging the various repairs and replacements aboard the PYRAMID VETERAN. Defendants contend that since the engineering manager was already in Mobile prior to the incident and was already working on other items involving the PYRAMID VETERAN, the time spent by Gifford on these repairs is not a compensable item of damage. The plaintiff relies upon *Freeport Sulphur, supra,* wherein the Fifth Circuit allowed recovery for a plaintiff's own internal engineering staff's repair efforts, where the testimony showed that they would have been doing other work absent these affairs. However, the Court is of the opinion that *Freeport Sulphur* is factually distinguishable from the case at bar. In the former, the defendant objected to the inclusion of the labor and overhead cost of the plaintiff's engineering department in the amount of a $16,000.00 damage claim for the cost of engineering work performed by the plaintiff's employees for the reconstruction of a dock. In rejecting the defendant's argument, the Fifth Circuit stated that the plaintiff's internal engineers could have been doing work on other projects had they not been working on the dock. *Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300, 303 (5th Cir. 1976). In the instant case, Gifford had already been in Mobile for several weeks and his job responsibilities specifically included working aboard the PYRAMID VETERAN. Gifford testified that while in Mobile he frequently visited the vessel as part of his daily work assignment. Admittedly, as a result of the accident Gifford contacted the Bender Welding and Machine Co.,

Inc., relating to the damaged gangway; however, there was no testimony that Gifford was unable to perform other duties and services aboard the vessel during this two and one-half day period. Accordingly, the Court finds that the engineering manager's time should not be allowed in the claims for damages suffered by the plaintiff.

8. Having determined what damages are to be apportioned, all that remains undecided is the percentage of liability between the parties. The Court finds that the defendants should be assigned sixty-six and two-thirds (66⅔%) percent of the liability and the plaintiff thirty-three and one-third percent (33⅓%). Therefore, the total damages to be awarded to the plaintiff is $4,294.46.[3]

A decree will be entered in accordance herewith.

---

3. The total damages to plaintiff are: $2,796.00 (gangplank), plus $3,645.69 or $6,441.69. This figure is reduced 33⅓% due to the liability assigned to the plaintiff ($6,441.69 – ⅓ = $4,294.46).