Steve ALAMIA, Plaintiff,

v.

CHEVRON TRANSPORTATION CORPORATION and Chevron Shipping Company, Defendants.

Civ. A. No. S85–1317(ng).

United States District Court,
S.D. Mississippi, S.D.

March 17, 1987.

Wynn E. Clark, Pascagoula, Miss., for plaintiff.

John M. Kinard, Pascagoula, Miss., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEX, District Judge.

This is a civil action for damages under the Court's admiralty jurisdiction pursuant to 28 U.S.C. Section 1333 and Art. III, Section 2 *U.S. CONST.*

Defendants are Chevron Transport Corporation (Transport) and Chevron Shipping Company (Shipping). The Plaintiff seeks recovery against the Defendants founded on a claim of negligence under the General Maritime Law arising out of an incident involving the Defendants' vessel, the tank-

er Chevron Frankfurt, and the Plaintiff's vessel, the shrimp trawler Sunset Ltd.

The Court has heard evidence in a non-jury trial. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### Findings of Fact

1. Plaintiff Steve Alamia is an adult resident citizen and domicilary of Jackson County, Mississippi. Alamia is the owner of a fifty-two (52) foot shrimp boat, the F/V Sunset Ltd., which is commonly referred to as a Biloxi-type lugger shrimp trawler. Alamia primarily works his vessel alone in the inland waters of Mississippi and Louisiana. The Sunset Ltd. is of wood construction.

2. Defendant Transport is the bareboat charterer of the Chevron Frankfurt, which vessel is owned by Ocean Tankship Corporation. The vessel is managed by Defendant Shipping. Both Transport and Shipping are foreign corporations doing business in the State of Mississippi.

3. On or about October 11, 1985, within the navigable waters of the United States, the Chevron Frankfurt left Bayou Cassotte in the Port of Pascagoula, Mississippi, and proceeded in the Bayou Cassotte and Pascagoula ship channel. The Chevron Frankfurt is a tanker constructed of steel approximately 776 feet in length and 120 feet wide, with a draft of approximately 26 feet and bases its operations out of the Bayou Cassotte terminal in the Port of Pascagoula, Mississippi.

4. The Bayou Cassotte and Pascagoula ship channels merge at a point almost due south of the entrance to Bayou Cassotte, and the ship channel continues southward to Horn Island Pass, eventually leading to the Gulf of Mexico. A chart of the area is in evidence which shows the general layout of the ship channel and the channel leading to Bayou Cassotte. The Pascagoula and Bayou Cassotte ship channel has an average depth of 38 feet, and the area on the east or west side of the Bayou Cassotte and Pascagoula ship channel is a shoal area in which the water depth decreases rapidly to 10 or 12 feet.

5. The Jackson County Port Authority, acting pursuant to Mississippi Code of 1972, Section 59–9–17, has established a Tariff to govern activities within the harbor limits of the Port of Pascagoula. Tariff No. 1–E, Rule 49, Channel Obstructions, reads as follows:

> No vessel, person or persons, shall tow or travel, fish or for that purpose set any line, trawl, seine or net of any kind in the main ship channel, turning basin or harbor waterways.

Rule 49 is not, however, enforced; the Port Authority permits shippers to fish in the channel as long as their vessels give way to ships utilizing the channel.

6. At the time of the incident, the Plaintiff was engaged in shrimping operations in the Mississippi Sound in the shoal area on the west side of the Bayou Cassotte leg of the Pascagoula ship channel. The Plaintiff was alone aboard the F/V Sunset Ltd., and had just moved from the ship channel as the Chevron Frankfurt was approaching from the mouth of Bayou Cassotte. Alamia had just brought his shrimping gear from the bottom and was in the process of "rounding up" the vessel in order to dump the catch on deck. By this process, the vessel is put in a hard turn in order to bring the net to the side of the boat, where it can be lifted on deck.

7. The weather was clear, and there is no testimony to indicate that the wind and tide conditions were other than normal. At least two other vessels were engaged in shrimping operations in the area of the Pascagoula and Bayou Cassotte ship channel. Robert O'Bannon was operating his shrimper, the F/V Betty K., also on the west side of the Bayou Cassotte leg of the Pascagoula ship channel but to the south of the Sunset Ltd. Herbert Erwin was shrimping the same area with his vessel, the F/V Brenda D. Both individuals testified that weather conditions were normal on the day in question.

8. A document referred to by witnesses as a "vessel/pilot information sheet" was received into evidence along with an attached plot of the movement of the Chevron Frankfurt on October 11, 1985. It is

admitted that the Chevron Frankfurt did travel from the Chevron Refinery out of the Bayou Cassotte ship channel on October 11, 1985, and the vessel information document and the attached bell book confirms that the Chevron Frankfurt departed Bayou Cassotte shortly after 11:00 a.m. on October 11, 1985. The plot of the Pascagoula and Bayou Cassotte ship channel attached to the vessel information document indicates that the Chevron Frankfurt passed the area of Plaintiff's vessel at approximately 12:21 p.m. At that time the vessel was travelling the ship channel at full speed which ranged from 8 knots to 11.1 knots according to the testimony of the bar pilot on the vessel at the time and page one of the "vessel/pilot information sheet." The Chevron Frankfurt was not required to travel at full speed in order to safely negotiate the Pascagoula and Bayou Cassotte ship channel.

9. Also offered in evidence were the marine regulations promulgated by Shipping which governed the navigation and movement of the Chevron Frankfurt. The regulations also require the master of the vessel to present the pilot with a completed vessel/pilot information document, and require the master to see that the pilot regulates the ship's speed in inland waters "to prevent wave damage when passing small craft, tows, and shore areas". Marine Regulation No. 400, Section 2350, pp. 2–12. Lastly, the Marine Regulations make it clear that the master of the Chevron Frankfurt is in no way relieved of responsibility for the safe navigation of the vessel by the presence of a pilot on board, and the master must continue to oversee speed and adherence to the rules of the Road. *Id.*

10. As the Chevron Frankfurt proceeded in the Pascagoula and Bayou Cassotte ship channel at full speed it produced a large wake and swell, the effect of which would be felt by small craft and other vessels on the shoal area on either side of the ship channel.

11. According to the Plaintiff, the Chevron Frankfurt produced an excessive wake which struck the Sunset Ltd., with such force that the Sunset Ltd. heeled over and some of the vessel's gear and the day's catch were thrown overboard.

12. The Plaintiff's version of the incident is corroborated by the testimony of O'Bannon and Erwin who also indicated that the wake from the Chevron Frankfurt was excessive and unusually large.

13. The Court concludes that the wake produced by the Chevron Frankfurt was excessive under the circumstances and therefore accepts the testimony of the Plaintiff.

14. As a result of the incident, the Plaintiff lost 220 pounds of 15/20 count shrimp that were on board the vessel which spilled overboard, and was required to dry dock the vessel to make repairs for leaks which occurred after the incident. In addition to his own labor of 40 hours, the Plaintiff was required to pay a dry dock fee and buy cotton and nails to re-caulk the bottom of the Sunset Ltd. to stop the leaking. The Court accepts as true Plaintiff's uncontradicted testimony as to the value of his lost catch and the cost of repairs as reflected in an itemization of expenses attached hereto as an addendum.

15. Personal property and gear were also lost in the incident when the swells of the Chevron Frankfurt struck the Sunset Ltd. The personal property and gear lost included 2 nets, 1 shovel, 1 rake, 5 gallons of lube oil, 12 plates, 8 cups, 1 stay wire, 6 shrimp baskets, and 1 nylon line. The Court accepts Plaintiff's testimony as to the value of his lost personal property except for the testimony regarding two (2) new nets. Plaintiff claimed to have purchased these nets recently from "a Cajun". He could recall neither the name or location of the business from which the nets were supposedly purchased or the name of the salesperson with whom he allegedly dealt; Plaintiff could produce no receipt for these new nets. O'Bannon and Erwin corroborated Plaintiff's statement that he in fact had two spare nets on the roof of his cabin at the time of the incident; however, the Court as fact finder concludes that Plaintiff failed to sustain his burden of proving the value of the nets.

16. Plaintiff also claimed damage to the vessel's winch and the loss of approximately four days of fishing as a result of the incident. As the finder of fact in the non-jury case, the Court wholly rejects Plaintiff's claim for damages with respect to the winch. Plaintiff has not had the winch repaired; nonetheless, he continues to utilize the F/V Sunset Ltd. to fish. As to Plaintiff's contention that he lost four days of fishing, the Court as fact finder concludes that Plaintiff has failed to sustain his burden of proving this alleged loss by a preponderance of the evidence. Plaintiff did not place his vessel in dry dock until July, 1986, some nine months after the incident in question. Plaintiff testified that from October, 1984, until January, 1986, he added two pumps which he already owned to control the water leakage on the vessel as a result of the incident. Under these facts the Court cannot believe that Plaintiff lost any time.

17. In total Plaintiff has out-of-pocket loss of $1,774.28 as reflected in an itemization of expenses attached hereto as an addendum.

## Conclusions of Law

■ 1. The Court has admiralty jurisdiction over this controversy in that this cause involves an alleged tort committed upon the navigable waters of the United States involving a subject matter with maritime nexus. *Executive Jet Aviation, Inc. v. City Cleveland*, 409 U.S. 249, 266–67, 93 S.Ct. 493, 503–04, 34 L.Ed.2d 454 (1972).

2. This is a wake damage case. In such cases the rule of law is as follows:

A vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion through the water at the particular place and under the particular circumstances where the injury occurred, and her officers are required to take into consideration others who may reasonably be expected to be affected, and to take all reasonable precautions to avoid their injury even though former experience has shown that in the ordinary and usual course of the events they are likely to escape injury or that the larger vessel was proceeding on ordinary course and at her customary speed. Smaller craft have the right to assume larger craft aware of their presence will observe reasonable precautions and are under no duty to warn the larger vessel of the danger.

*Moran v. The M/V Georgie May*, 164 F.Supp. 881, 884–85 (S.D.Fla.1958).

■ 3. In cases where a large vessel must travel a narrow channel, the fact that the vessel needs to travel at a speed sufficient to avoid running aground or losing steerage does not relieve the vessel from liability from any damage incurred as a result of the certain wake to be produced by the displacement of water. In this situation, it has been observed that "there may well be a duty upon a moving vessel to proceed under the vessel's own power below steerage way speed, relying upon tugs to provide all steering ..." *Creole Shipping Ltd. v. Diamandis Pateras, Ltd.*, 410 F.Supp. 313, 316 (S.D.Ala.1976).

■ 4. The general admiralty rule and the Fifth Circuit rule, regarding wakes is that the fact of injury from swells established *prima facie* liability of the vessel creating the swell. *West India Fruit and S.S. Co. v. Raymond*, 190 F.2d 673, 674 (5th Cir.1951). The offending vessel must "exonerate herself from blame by showing that it was not in her power to prevent the injury by adopting any practical precautions." *Id. See also, Ladd v. United States*, 97 F.Supp. 80, 83 (E.D.Va.1951).

5. Further, Defendant has imposed upon itself by its Marine Regulations the duty to "regulate the ship's speed to prevent wave damage when passing small craft ..." Marine Regulation No. 400, Section 2350, pp. 2–12.

6. Additionally, the controversy must be measured against the background of the *Inland Navigation Rules Act of 1980*, codified at 33 U.S.C. § 2001, et seq. Under these statutory rules, the Defendants' vessel was required to keep a proper lookout for other vessels. 33 U.S.C. § 2005. Fur-

ther, the Defendants' vessel was required to maintain a safe speed consistent with several factors set forth in the statute. 33 U.S.C. § 2006. Specifically with relation to speed, the Defendants' vessel was required to have due regard for other fishing vessels in the area and the location of other vessels. 33 U.S.C. § 2006(a)(ii) and (b)(v).

■ 7. Once a statutory violation is established the burden shifts to the offending vessel under the rule of *The Pennsylvania* to show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been" the cause of the mishap. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148, 151 (1874). The rule of *The Pennsylvania* is not a rule of liability, but shifts the burden of proof as to causation. *Green v. Crow*, 243 F.2d 401, 403 (5th Cir.1957).

8. The Plaintiff's testimony concerning the size of the wake of the Chevron Frankfurt was corroborated by witnesses O'Bannon and Erwin, and the Court credits the Plaintiff's version of the incident. Indeed, the Defendants' own records indicate that the vessel was travelling at full speed at or near the time of the incident in the narrow Bayou Cassotte leg of the Pascagoula ship channel. Unquestionably, a tanker the size of the Chevron Frankfurt would produce a significant wake or swell at that speed and particularly in the shoal areas on either side of the channel.

9. Neither bar pilot Jacob Foster or any witnesses produced by the Defendants testified that they knew what happened on October 11, 1984, and no one could recall even seeing the F/V Sunset Ltd. or any other shrimp trawler in the area on that day.

■ 10. The Court finds that the vessel was negligently operated at an excessive rate of speed under the circumstances then existing, and that the officers and crew of the Chevron Frankfurt were negligent in failing to maintain a proper lookout for other fishing vessels in the area. The Court further finds that this negligence was the proximate cause of the damages sustained by the Plaintiff.

11. The Court further finds that this deviation from the reasonable care standard under the general maritime law is also a violation of the *Inland Navigation Rules Act of 1980* as to speed and lookout. 33 U.S.C. §§ 2005, 2006. No evidence to the contrary having been produced by the Defendants, the Defendants have failed to make a showing to discharge their burden under the rule of *The Pennsylvania.*

12. The Court further finds from the evidence that the Plaintiff was not contributorily negligent in the operation of the F/V Sunset Ltd.

■ 13. As to damage, the Court essentially accepts the testimony of the Plaintiff as to his damages as reflected in the findings of fact above. The Plaintiff is entitled to be placed "as nearly as possible in the condition he would have occupied if the wrong had not occurred." *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir.1976); *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1982). The Court finds that the Plaintiff is entitled to an award of compensatory damages in the sum of $1,774.28.

■ 14. Under the general maritime law, an award of pre-judgment interest from the date of the loss is the rule—"not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." *Noritake Co., Inc., v. M/V Champion*, 627 F.2d 724, 728 (5th Cir.1980); *Complaint of M/V Vulcan*, 553 F.2d 489, 490 (5th Cir.1977). Although the Court has some discretion in the matter, the award of pre-judgment interest is "well-nigh automatic." *Masters v. Transworld Drilling Co.*, 688 F.2d 1013, 1014 (5th Cir.1982). Interest will accrue from the date of the incident or loss. *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 593 (5th Cir.1986).

15. The Court finds no exceptional or peculiar circumstances justifying denial of pre-judgment interest, and the Plaintiff is entitled to an award of pre-judgment interest from the date of the loss which the Court finds to be October 11, 1985. The

Court also finds that the rate of interest should be six percent (6%). *Gator Marine Service Towing, Inc. v. J. Ray McDermott and Co.*, 651 F.2d 1096, 1100–01 (5th Cir. 1981).

16. The Plaintiff is not entitled to an award of attorney's fees. *Noritake Co., Inc. v. M/V Hellenic Champion, supra,* at 730–31.

17. All costs of Court are hereby taxed to the Defendants. A Judgment consistent with these findings of fact and conclusions of law shall be submitted by Plaintiff's counsel within ten (10) days from the date hereof.

### ADDENDUM

#### Itemization of Expenses

| | |
|---|---|
| 1 shovel | 15.00 |
| 1 rake | 4.50 |
| 5 gallons oil | 22.36 |
| 12 plates | 12.00 |
| 8 cups | 5.00 |
| 1 stay wire | 18.00 |
| 6 baskets @ $20.00 each | 120.00 |
| lazy line | 30.00 |
| 120 lbs. of $^{15}/_{20}$ shrimp @ $3.80/lb. | 456.00 |
| 100 lbs. of $^{15}/_{20}$ shrimp @ $3.80/lb. | 380.00 |
| Drydock fee | 286.42 |
| 3½ lbs. of cotton @ $6.00/lb. | 21.00 |
| 2 lbs. nails | 4.00 |
| 40 hrs. @ $10.00/hour | 400.00 |
| TOTAL EXPENSE: | $1,774.28 |