O'DONNELL TRANSPORTATION CO.,
Inc., Libelant,

v.

M/V MARYLAND TRADER, American
Trading and Production Corpora-
tion, Claimant.

W. J. TOWNSEND, d/b/a Townsend
Transportation Company, Libelant,

v.

M/V MARYLAND TRADER, American
Trading and Production Corpo-
ration, Claimant.

United States District Court
S. D. New York.

Nov. 26, 1963.

Purdy, Lamb & Catoggio, New York City, for libelant O'Donnell Transp. Co., Inc.; Edmund F. Lamb, New York City, of counsel.

Foley & Martin, New York City, for libelant W. J. Townsend; John H. Hanrahan, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, for M/V Maryland Trader; Eugene Underwood, Joseph C. Smith, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

These are two suits in rem to recover for swell damage to vessels moored in libelants' yards at Tottenville, Staten Island, and to installations at the yards, allegedly caused by the claimant M/V Maryland Trader, a T–2 tanker, on December 21, 1959. The suits were tried together before me.

Libelant O'Donnell Transportation Company, Inc. (O'Donnell) operated a boat yard at Tottenville where a tug, barges and other craft were tied up. Libelant W. J. Townsend doing business as Townsend Transportation Company (Townsend) operated an adjacent yard at which barges, miscellaneous vessels and a floating drydock were moored.

On December 21, 1959 the Trader was proceeding inbound fully loaded up the Arthur Kill to Carteret, New Jersey, north of libelant's yards, where she was to discharge her cargo. Both libelants claim that when the Trader passed their yards about 10 a. m. she was moving at excessive speed, very close in and caused unusually heavy swells and suction which severely damaged vessels, docks, bulkheads and moorings.

The Trader, on the other hand, asserts that she was proceeding up mid-channel with due care and caution at normal and proper speed and that her mild and quite usual swell could not have caused and did not cause the damage complained of. She further contends that if there was an unusual or excessive swell on the morning in question it was not caused by her but by another vessel, the S.S. Esso Gettysburg, a larger tanker which was proceeding outbound down Arthur Kill in ballast about the same time. The Trader also contends that, in any event, the vessels which libelants claim to have been damaged were in bad condition and unseaworthy and were not properly moored and that the docks and appurtenances in the yards were also old and rotten. It asserts that the vessels, moorings, docks and appurtenances were unable to withstand the normal and usual swells which were reasonably to be anticipated and that any damage to them was not due to any fault of the Trader.

The pertinent evidence adduced at the trial on the question of liability may be summarized as follows:

Inbound from Raritan Bay, Arthur Kill which separates Staten Island from the New Jersey mainland, runs roughly from southwest to northeast passing from Ward Point Bend (west) into Outerbridge Reach until it reaches Red Buoy No. 2. At that point it bends to the northward and runs in that direction, passing under the cantilever bridge at Outerbridge Crossing. Carteret, New Jersey, to which the Trader was bound to discharge her cargo, lies some distance to the north of Outerbridge Crossing.

The libelants' yards are situated on the Staten Island or eastern shore of the Kill, below Outerbridge Crossing and south of Red Buoy No. 2.

Proceeding inbound up-channel, vessels reach the O'Donnell yard some 900 yards south of Red Buoy No. 2. Adjacent to the O'Donnell yard on the northeast is a Moran Towboat Dock. Next comes the Townsend yard some 400 yards south of Red Buoy No. 2. Both yards lie on the southeasterly shore of a bay or indentation to the eastward of the channel at the mouth of Mill Creek.

Arthur Kill is a heavily travelled waterway and as many as six to eight large tankers inbound or outbound pass the libelants' yards daily. The channel of the Kill off libelants' yards is 600 feet wide and 35 feet deep at mean low water.

The outer limit of the O'Donnell yard is approximately 200 feet to the eastward of the easterly line of the channel and as the yard runs to the shoreline the water shoals to six to nine feet at low tide. On the morning in question there were a number of barges and a tug tied up there, some directly to piers or bulkheads and others to one another.

The outer limits of the Townsend yards to the northeast are farther removed from the easterly line of the channel and the main dock in the yard extends out about 600 feet from bulkheads at the shoreline. There is also shoaling as the shore is approached. A drydock some 230 feet long and 80 to 85 feet in width was tied up at the shore end of the main Townsend pier. There were also tugs, barges and converted L.S.T.'s tied up in the yard.

At the time of the occurrence complained of, the tide was two-thirds to three-quarters flood moving north between 1.1 and 1.4 knots. There were no weather conditions of significance.

The Maryland Trader is a jumboized turbo-electric single screw T-2 tanker, 572 feet long, 75 feet beam, with a deadweight tonnage of 19,800. She had a maximum of 6,800 horsepower and was capable of developing full speed under fair weather conditions of 15 knots. Her displacement tonnage loaded, as she was at the time, was 26,160 with a draft fully laden of 30 feet.

Two Townsend employees testified at the trial as to the alleged cause of damage and the deposition of one O'Donnell employee was read into the record.

Luttrell, one of the Townsend employees, testified that "around 10 o'clock" on the morning in question while he was drawing water in the yard, "all at once everything kept flowing in the slip and coming out, and then, all at once the water kept going right out the slip and everything went with it." He said that the cables which tied the 200 foot drydock to the shore and of the pier were broken both fore and aft, the drydock was thrown against the bulkhead at the shoreline, the apron on the drydock was broken, the pier and bulkhead were damaged and lines were parted on other vessels. Luttrell said that he then looked down the dock and saw the Trader going by on the easterly edge of the channel closer than vessels generally did and "faster than anyone I ever seen going up there." He also noticed the Esso Gettysburg on the other side of the channel outbound "just creeping down the other shore." The vessels had already passed one another and the Esso was below the Trader. He also noticed a Moran tug following the Trader which joined her just below Outerbridge Crossing Bridge.

The second Townsend employee, Caison, testified that he was in the galley of the tug Syosset tied up at one of the Townsend docks on that morning when he felt the lines on that tug and on the tug tied up alongside it surge and the two tugs ran up and down though they were undamaged. When he went to the stern of the Syosset he saw the Trader "going by close to the dock." However, when asked to indicate the Trader's position he placed it at Red Buoy No. 2, some 400 yards to the north. He said he did not see the Esso Gettysburg and did not notice whether there were any vessels in the vicinity on the other side of the Kill.

The deposition of Monsen, the O'Donnell employee, was taken while he was in the hospital. Monsen said that on the morning of December 21 there was a "smack-up" at the O'Donnell yard and that barges were banging about. He saw a tanker "down toward the bridge" (plainly Outerbridge Crossing) beyond the Townsend yard. Though in no position to judge, he indicated that she was going "fast" and said he identified her as the Trader by the name on her stern. He later noticed that the lines on some of the vessels in the yard were broken

and cleats pulled out. Monsen did not fix the time of this occurrence, nor did he remember whether any other vessel was outbound at the time.

The movements, speed and timing of the Trader on her passage up Arthur Kill on that morning are fixed with reasonable accuracy by the witnesses who testified in her behalf, as corroborated by the decklog, the deck bell book and the engine bell book. The witnesses included her master, Captain Smith, her chief officer Pettijohn, her third mate Bullard, and her third assistant engineer Coran, as well as her docking pilot Captain Barnes, and her Sandy Hook pilot Captain Breitenfeld.

The Trader arrived at Ambrose Light Vessel inbound at 0642 on the morning of December 21, 1959, ahead of schedule. At 0752 she started up Ambrose Channel with Captain Breitenfeld, her Sandy Hook pilot, aboard. She was to meet a tug, drop off her Sandy Hook pilot and take on a docking pilot in Ward Point Bend off Hylan Boulevard on Staten Island about 10 o'clock. She arrived off Hylan Boulevard at 0949 and had been proceeding past the Perth Amboy anchorage for several minutes at dead slow, aided by an occasional "kick-ahead" to half speed which was required to maintain steerageway. A Moran tug met her there, took off her Sandy Hook Pilot, Captain Breitenfeld, and put aboard her docking pilot, Captain Barnes. She continued at dead slow until 0951 or 0952 when her engines were put slow ahead. At 0955 she was abeam Perth Amboy Ferry landing and continued up mid-channel at slow ahead.

She sighted the Esso Gettysburg to the north outbound and, at 1000½, she blew one blast for a port to port passage and put her rudder 5° starboard. She was still moving at slow ahead and was approximately in mid-channel. At 1003 she was about 200′ south of Red Buoy No. 2, and about to move into the bend in Outerbridge Reach. At that point, already well past libelants' yards, she was still at slow ahead and put her engines to half ahead. Still at that speed

she passed the Esso Gettysburg at 1005 about two ship lengths below Outerbridge Crossing Bridge.

The distance from abeam Perth Amboy Ferry landing where the Trader was at 0955 to the point where she passed the Esso at 1005 is approximately 6,500 feet. The elapsed time in which the Trader covered that distance was some 10 minutes, give or take, and her average speed was 6.5 knots over the ground. Since the flood tide underfoot was carrying her forward over the ground at between 1.1 and 1.4 knots her average speed through the water during this period was between 5.1 and 5.4 knots.

However, during two minutes of this ten minute interval (from 1003 to 1005) the Trader's engines were increased from slow ahead to half ahead. Even allowing for some lag in pick-up in speed during this two minute period her speed during the preceding eight minutes, when she was going at slow ahead, was necessarily less than the overall average for the entire distance. Her speed during the eight minute period therefore may be reasonably estimated at about 5 knots through the water, or a mile in twelve minutes, scarcely more than fast walking speed. She was proceeding at this speed at mid-channel when she passed libelants' yards.

I am well aware that there are inevitable inaccuracies in estimated positions and in estimated or even recorded times. But allowing for reasonable variations on this account, the Trader's speed through the water could not have varied significantly from this estimate.

There was reliable and uncontradicted testimony by both the Sandy Hook and the docking pilots that the customary speed of loaded tankers in that stretch of water was 5 to 8 knots over the ground. Thus if the evidence on behalf of the Trader is accepted her speed as she was passing the libelants' yards was not at all excessive or unusual and, in fact, was moderate and normal.

There was credible evidence that the Trader did not make any substantial disturbance in the water while she was mov-

ing from the Perth Amboy ferry dock to Red Buoy No. 2 beyond the libelants' yards. Her master, her third mate and her docking pilot all testified as to observations of her bow wave during this period. According to their testimony the bow wave was less than a foot high and was diminishing rapidly as it moved away from the vessel. Turbulence from her propeller could not have been a significant factor for propeller wash continues in a straight line behind the vessel and soon loses force.

Dr. Newman, a civilian employee of the Department of the Navy, engaged in research in the laboratory of the Bureau of Ships, and a well qualified expert on wave action caused by ships in motion, also testified for the Trader. Dr. Newman was of the opinion that a vessel of the dimensions and displacement of the Trader travelling at six knots over the ground or five knots through the water at Arthur Kill would generate waves approximately three or four inches high with a distance of 9 to 13 feet between their successive crests. If she were moving at the speed of an additional knot the waves would be an inch higher and the distance between them about four feet greater.

The waves referred to by Dr. Newman were the so-called Kelvin waves caused by displacement of water as the ship moved forward, which diverged from the bow in a V-shaped pattern and eventually reached the shore, diminishing as they proceeded farther from the vessel. They could not conceivably have generated or accounted for the heavy swells and surge described by libelants' witnesses.

We come next to the evidence regarding the Esso Gettysburg and her speed and movements about the time the surge or swell occurred which is alleged to have caused the damage. As has been indicated, the Esso passed the Trader one or two shiplengths to the south of Outerbridge Crossing at 1005. The Trader's witnesses, Smith, Pettijohn, Bullard and Barnes, all had opportunity to observe the Esso as they approached and passed her.

The Esso was a vessel considerably larger than the Trader. She was 715 feet long, 93 feet beam, and her gross tonnage was 24,600. As has been indicated, she was proceeding outbound in heavy ballast and her draft in ballast was 25 to 26 feet. The witnesses who observed her estimated her speed at from 10 to 12 knots and it may be noted that she was proceeding against a tide running in excess of a knot. According to one witness she was "pushing a great deal of water in front of her" and in the words of another "had a foaming white mustache." It seems plain that she was throwing a heavy bow wave. At the speed at which she was travelling it would have taken her but a few minutes to have reached and passed the libelants' yards. At that speed she was quite capable of producing a substantial swell or surge.

Dr. Newman, the Trader's wave expert, also testified as to the possibility that the Esso, travelling at this speed in a 600 foot channel, had generated what he called a "hydraulic jump type or shock wave" which would be pushed out in front of the vessel and move with considerable force directly ahead of her as she proceeded. The jump or shock wave is of course quite different from the ordinary V-shaped diverging waves generated by the normal passage of a vessel through the water. According to the theory advanced by Newman, the jump or shock wave phenomenon occurs only beyond a certain critical speed under certain critical combinations of conditions. Given size and draft of a vessel and width and depth of channel, it can be calculated by formula at what speed under such conditions the vessel would produce the jump wave phenomenon. Newman's application of the formula to the Esso under assumed conditions as to width and depth of channel indicated that the critical speed in her case was about 12 knots.

However, the testimony of Newman on this subject was entirely too vague and speculative to have any evidentiary value. He made it clear that the theory was not well understood and that no firm con-

clusions could be drawn as to whether it was valid or not. He refused to say that there was any reasonable probability that such a phenomenon had occurred in the case of the Esso and, indeed, the assumed conditions on which hypothetical questions were based did not allow, among other things, for the physical facts that there were substantial expanses of water outside the channel limits which might have altered Newman's calculations entirely. His testimony on this subject must be disregarded.

We are left then with what, at first blush, appears to be a conflict between the evidence for the libelants and that for the Trader. As I shall point out a little later that conflict, in important respects, is more apparent than real.

But apart from this I was not impressed by the reliability of libelants' witnesses and I give little credence to their testimony with respect to the position, movement and timing of the Trader as she proceeded up the Kill. Their testimony, on these matters at least, was vague, in many respects inconsistent, at times evasive and unconvincing. Both their testimony that the Trader was proceeding very fast and that she passed close to the end of libelants' docks is incredible and contrived.

Quite a different impression was made by the witnesses for the Trader. They struck me as straightforward and thoroughly believable and their testimony was corroborated in substantial measure by the decklog and deck and engine room bell books contemporaneously kept as the Trader proceeded up the Kill. I accept their testimony that the Trader was proceeding at a moderate speed, that this was the reasonable and customary speed at which vessels of this character normally proceeded up the Kill, and that she was causing no substantial disturbance in the water and, indeed, no disturbance which could have caused the swell and surge complained of. There was corroboration of this by the expert testimony of the witness Newman with respect to the nature and size of the diverging or Kelvin waves that would be caused by the Trader when proceeding at the indicated speed. She was approximately at mid-channel as she passed the yards and not close in as libelants claimed.

Moreover, if the testimony of the libelants' witnesses that a heavy swell or surge did occur sometime on that morning which tossed about the very sizeable vessels in the libelants' yards in the manner described be accepted, these witnesses failed to fix the time of the occurrence with a sufficient degree of accuracy to identify it with the Trader. The only witness for the libelants who testified as to time was Luttrell who said it was "around 10 o'clock." The other two witnesses merely said the swell and surge occurred during the morning without fixing any time at all. The libelants' witnesses also placed the Trader in widely varying positions from just off the Townsend docks (Luttrell) to 400 yards north at Red Buoy No. 2 (Caison). Luttrell admitted that at the time he saw the Trader she had already been passed by the outbound Esso. The other witnesses were unable to state whether there were other vessels in the vicinity. Caison claims not to have seen the Esso at all, and Monsen could not state whether the Esso was across channel or not. To add to the confusion, the original claim letter sent by O'Donnell to the owners of the Trader, only three days after the event, gave the time of the occurrence as 10:30.

On the record as a whole I find that it was not established that the Trader caused the heavy swell or surge described by the libelants' witnesses if such a swell or surge did in fact occur.

Moreover, in view of libelants' failure to fix the time of the occurrence with any degree of accuracy it is probable that the Esso was passing or had just passed the libelants' yards at the time the swell or surge occurred. The Esso, a vessel considerably larger than the Trader, and moving much faster against the flood tide, was quite capable of causing a heavy swell or surge and may well have done

so.[1] In any event the Esso could not reasonably be excluded as a competent producing cause of the swell or surge described by libelants.

A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suction which would damage craft properly moored or installations along the shoreline. West India Fruit & S. S. Co. v. Raymond, 190 F.2d 673 (5 Cir. 1951); The Hendrick Hudson, 163 F. 862 (S.D. N.Y.), aff'd 168 F. 1021 (2 Cir. 1909); James Shewan & Sons v. New England Navigation Co., 155 F. 860 (E.D.N.Y. 1907), rev'd on other grounds 169 F. 285 (2 Cir. 1909). See also The Priscilla, 15 F.2d 455 (S.D.N.Y.1926). The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage. Moran v. The M/V Georgie May, 164 F.Supp. 881 (S. D.Fla.1958); Ferryboat Columbia, 1937 A.M.C. 881 (E.D.N.Y.); The Southern Cross, 21 F.2d 75 (E.D.N.Y.), aff'd 21 F.2d 76 (2 Cir. 1927); The Rotherfield, 123 F. 460 (S.D.Ala.1903). See also The Chester W. Chapin, 155 F. 854 (E.D. N.Y.1907); The Majestic, 48 F. 730 (2 Cir. 1891).

On the other hand piers and docks along the shoreline are required to be kept in proper condition and vessels tied up there must be seaworthy and properly moored so as to resist ordinary and normal swells in narrow waters where heavy traffic may be anticipated. Some wash from passing vessels is bound to occur and must be anticipated and guarded against. Only unusual swells or suction which cannot be reasonably anticipated furnish the basis for a claim. See James Shewan & Sons v. New England Navigation Co., supra; Drake v. Inland

Waterways Corp., 111 F.Supp. 891 (E.D. Mo.1953); Martin Marine Transp. Co. v. U. S., 66 F.Supp. 673 (E.D.Pa.1946).

Once libelant has established that swells or suction caused damage to its craft tied up at the shoreline, that such craft were properly moored to resist ordinary swell and suction normally to be anticipated, and that the swells came from the passing vessel charged with liability, the vessel which caused the swell is then required to exonerate itself from blame. In order to avoid liability she must show that it was not in her power to prevent the injury by any practical precautions she could have adopted. West India Fruit & S. S. Co. v. Raymond, supra; Ferryboat Columbia, supra; The Rotherfield, supra.

But it is of course an essential part of libelants' case against a passing vessel claimed to have caused swell damage to establish that the swells came from the particular vessel against which the claim is asserted. Manhattan Lighterage Co. v. New England Navigation Co., 204 F. 270 (2 Cir. 1913). See also Salaky v. The Atlas Barge No. 3, 208 F.2d 174 (2 Cir. 1953). On the case as a whole libelants failed to establish this essential element of liability. While the testimony of their witnesses, if believed, might have been sufficient to indicate that the swells alleged to have caused the damage came from the Trader, the evidence for the Trader which, as I have indicated, I accept, established that they did not. During her passage past libelants' yards the Trader was proceeding in a reasonable and cautious manner. Her speed at slow ahead of about 5 knots through the water was the normal and customary speed for loaded tankers inbound up Arthur Kill. Such speeds had apparently not caused any swell damage in the past and would not have caused the damage described on this occasion. Her course, substantially up mid-channel, was not unduly close to libelants' installations.

1. In making this finding I am referring to the normal diverging or Kelvin wave generated by a moving vessel and not to the hydraulic or jump wave described by Dr. Newman.

The Trader created no substantial disturbance in the water. Her observed bow waves were slight and diminishing as they diverged from the ship. The claim that the Trader was proceeding at excessive speed and too close to the edge of the channel is negatived by the evidence.

Moreover, it was not shown that the Trader was the only vessel in the vicinity which could have caused the offending swells. Libelants by no means eliminated the possibility that such swells were caused by some other vessel, and, indeed, it was affirmatively established that the Esso Gettysburg proceeding outbound in the opposite direction might well have caused them.

Under these circumstances the Trader cannot be held liable for any damage to libelants' craft or installations which may have occurred. Since it was not established that her movements generated the swells and surges claimed to have caused the damage, and having shown that she was proceeding at moderate speed with due care and caution, she was not required to exonerate herself further. See West India Fruit & S. S. Co. v. Raymond, supra, 190 F.2d at 674; Ferryboat Columbia, supra, 1937 A.M.C. at 884.

What has been said makes it unnecessary to discuss the Trader's further contention that the libelants have not sustained their burden of showing that the vessels allegedly damaged were seaworthy and properly moored and fendered so as to be able to withstand normal movements of the water, and that the damage was not caused by improper mooring and fendering of the allegedly damaged vessels.

It may be said that the evidence adduced by the libelants on these subjects was slim at best and there were indications that, for example, the Townsend drydock and various of the O'Donnell barges claimed to have been damaged were far from being in good condition. However, it is unnecessary to pass on this question in view of my finding that the responsibility of the Trader for any damage which may have occurred has not been established and that she is therefore not liable in the premises.

The libels will be dismissed with costs and decrees entered accordingly.

The foregoing constitutes my findings of fact and conclusions of law in these cases.

It is so ordered.