**NEW ORLEANS STEAMBOAT COMPANY**

v.

**M/T HELLESPONT GLORY, et al.**

**Civ. A. No. 81–4239.**

United States District Court,
E.D. Louisiana.

April 22, 1983.

As Amended April 28, 1983.

Robert D. Hoffman, Jr., New Orleans, La., for plaintiff.

Gregg L. Spyridon, New Orleans, La., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

Plaintiff New Orleans Steamboat Company, owner of the riverboat PRESIDENT, brings this action against M/T HELLESPONT GLORY and its owner Satyr Overseas Navigation, Inc., for damages sustained by PRESIDENT's gangway caused by the surging of PRESIDENT at her berth due to wave wash created by the defendant vessel. Trial without jury was held on March 8, 1983, and the matter taken under submission. To the extent that any of the following findings of fact constitute conclusions of law, they are so adopted. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

*Findings of Fact*

1. New Orleans Steamboat Company is a Louisiana corporation which, at all material times, was the owner and operator of the riverboat PRESIDENT, having purchased said vessel in January of 1981.

2. On July 26, 1981, PRESIDENT was moored at her usual berth, the so-called Spanish Plaza Wharf. The Mississippi River depth is quite shallow where PRESIDENT is moored so that, on the day in question, there was only approximately two to three feet of water beneath PRESIDENT. The effects of wave wash are greater in that shallow depth than at other mooring sites, a fact known to the navigation officers of PRESIDENT and to her owners.

3. PRESIDENT was secured with thirteen lines, seven forward and six aft. PRESIDENT's gangway was in place. The gangway was of conventional construction, consisting of a platform on legs with wheels beneath them. The gangway was 4½ feet wide. In order to use this particular gangway configuration, it had been necessary to cut an opening in the facing concrete wall or abutment on the wharf. See Defend-

ant's exhibit 2. Plaintiff sought and obtained authorization from the Board of Commissioners of the Port of New Orleans to cut an eight foot wide opening in the wall. However, the actual width of the opening was more on the ~rder of eleven feet. Thus, about 3 feet of free movement existed on either side of the gangway, assuming that it was centered in the opening.

4. The prior owner of PRESIDENT had not used this gangway configuration.

5. Mr. Centanni, presently pilot and relief Captain of PRESIDENT, had also worked for the prior owners for a number of years. It was his experience that PRESIDENT had, on prior occasions, surged up to eight to ten feet at her moorings as a result of passing ship traffic, etc. Mr. Wilson disputed this, however, and testified that the plaintiffs had consulted with the prior owners before confecting the new gangway.

6. On July 26, 1981, at approximately 5:55 p.m., the downbound HELLESPONT GLORY passed the Spanish Plaza Wharf, according to Captain Gale of the PRESIDENT, coming as close as 500 to 600 feet to the moored PRESIDENT. HELLESPONT GLORY was forced to pass nearer than usual to the east bank of the river in order to make Algiers Point and because there was barge traffic on the west bank side of the river and a large tow on the center line. There was very little precise testimony as to the speed of the HELLESPONT GLORY when she passed, Captain Gale characterizing it simply as "too fast" and Mr. Centanni as "a good clip." Mr. Wilson, who was not present at the time of the incident but who had made an estimation based on the VTS tapes, offered an opinion of the vessel's speed as twelve to thirteen knots. Defendant offered no proof as to the vessel's speed. I believe that HELLESPONT GLORY was proceeding at approximately twelve knots.

7. As HELLESPONT GLORY passed the Spanish Plaza Wharf, PRESIDENT began surging. This resulted in contact between PRESIDENT's gangway and the concrete wall or abutment on the wharf in which the gangway access opening had

been cut. There was divergence of opinion as to the extent of the movement. Captain Gale, who was in the pilot house at the time of the accident, estimated the movement to be only 18 inches to 2 feet. Mr. Centanni, who was on the port (wharf) side of PRESIDENT when she surged, estimated the distance as much greater—8 to 10 feet. Given that the gangway was damaged on both sides, and given that the 4½ foot wide gangway was generally centered in the 11 foot opening, I conclude that PRESIDENT surged to a degree, closer to the approximation of Mr. Centanni. None of PRESIDENT's 13 lines parted. From this last fact, defendant would have me infer that the plaintiff's vessel was improperly moored. Given the imprecise testimony regarding the distance involved, however, I cannot make such an inference.

8. The damage to the gangway amounted to $9,634.41. Plaintiff alleges other in-house costs associated with this incident, as well as the loss of customer goodwill resulting from loss of use of the gangway, but offered no proof of the value of such costs.

*Conclusions of Law*

1. This court has jurisdiction over this matter pursuant to its admiralty and maritime jurisdiction. 28 U.S.C. § 1333.

2. The duty of a passing vessel in cases such as this has been stated as follows:
"A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suction which would damage craft properly moored or installations along the shoreline. The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage."
*Shell Pipe Line Corp. v. M/T CYS ALLIANCE,* 1982 A.M.C. 389, 395 (E.D.La.1981) (quoting *O'Donnell Transportation Co. v. M/V MARYLAND TRADER,* 228 F.Supp. 903, 909 (S.D.N.Y.1963) (citations omitted)).

3. Moored vessels are also under some duty to protect themselves:

> "On the other hand, piers and docks along the shoreline are required to be kept in proper condition and vessels tied up there must be seaworthy and properly moored so as to resist ordinary and normal swells in narrow waters where heavy traffic may be anticipated. Some wash from passing vessels is bound to occur and must be anticipated and guarded against. Only unusual swells or suction which cannot be reasonably anticipated furnish the basis for a claim."

*Id.* at 395–96 (quoting *O'Donnell,* 228 F.Supp. at 909).

4. Once a properly moored vessel proves that a passing vessel caused swells or suction that resulted in damage to the moored vessel, the passing vessel is obligated to exonerate itself from blame. *Id.* at 396.

5. Given the proximity of the wharf when HELLESPONT GLORY passed the properly moored PRESIDENT, I conclude that the HELLESPONT GLORY was travelling at an excessive rate of speed in breach of its duty to proceed carefully and prudently.

6. I also conclude, however, that while PRESIDENT was properly tied up, the gangway configuration was designed in such a way as to disallow a certain amount of foreseeable fore and aft vessel movement. While the design of the gangway assembly allowed for approximately three feet of surging, the concrete wall constituted an absolute limit on the movement of the gangway. Placement of the gangway in a configuration with such inflexible parameters constitutes a certain degree of fault.

7. In accordance with the admiralty rule of comparative fault, *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), I conclude that the damage to the plaintiff's gangway was caused twenty-five percent by the fault of the plaintiff and seventy-five percent by the fault of the defendant.

8. The plaintiff suffered damages in the amount of $9,634.41, the actual cost of repairing the gangway. The plaintiff did not carry its burden of proof with respect to the other alleged elements of damage. Because plaintiff was twenty-five percent at fault in causing its own damages, plaintiff shall recover from defendant the sum of $7,225.81, plus taxable costs.

Plaintiff shall submit a judgment consistent with this opinion.