**PETRO UNITED TERMINALS, INC.**
**and Insurance Company of**
**North America**

**v.**

**J.O. ODFJELL CHEMICAL CARRIERS,**
**Wintersport Tankers (Wintersport Ship Management B.V.), Johnson Maritime Services (Gulf), Inc. in personam, and the M/T JO LONN, her engines, tackle, apparel, furniture, etc. in rem; ESSO International Shipping (Bahamas) Company, Ltd., in personam, and the M/T ESSO MEXICO, her engines, tackle, apparel, furniture, etc., in rem.**

**Civ. A. No. 89–4326.**

United States District Court,
E.D. Louisiana.

Jan. 29, 1991.

Michael John Maginnis, Timothy Patrick Hurley, McGlinchey, Stafford, Cellini & Lang, New Orleans, La., for plaintiffs.

Hugh Ramsay Straub, Gerald M. Baca, Terriberry, Carroll & Yancey, New Orleans, La., for J.O. Odfjell Chemical Carriers III B.V., J.O. Odfjell Chemical Carriers, Wintersport Tankers, Wintersport Ship Management B.V., Johnson Maritime Services (Gulf), Inc., Jo Lonn M/T, her engines, tackle, apparel, furniture, etc.

Herbert O. Brickson, Thomas M. Schodowski, Bryant, Renneker & McLean, New Orleans, La., for Johnson Maritime Services (Gulf), Inc., Jo Lonn M/T, her engines, tackle, apparel, furniture, etc.

Thomas Deming Forbes, Joseph Dwight LeBlanc, Jr., Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Esso Intern. Shipping (Bahamas) Co., Ltd., Exxon Co. Intern., Exxon Shipping Co., Esso Mexico M/T, her engines, tackle, apparel, furniture, etc.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This admiralty matter came before the Court for trial on December 6, 7, and 12, 1990 and arises from damage to plaintiff Petro United Terminals, Inc.'s dock, in which it is claimed that the loss was due to the actions of the various parties to these proceedings. Particularly, plaintiffs, Petro United Terminals, Inc. and Insurance Company of North America (hereinafter called "Petro United"), claim that the defendants, Esso International Shipping (Bahamas) Company, Ltd., Exxon Company International, Exxon Shipping Company *in per-*

*sonam,* and the M/T ESSO MEXICO, her engines, tackle, apparel, furniture, etc., *in rem* (hereinafter called the "M/T ESSO MEXICO"), passed the docking facility of Petro United to which the M/T JO LONN (J.O. Odfjell Chemical Carriers, Wintersport Tankers (Wintersport Ship Management B.V.), and Johnson Maritime Services (Gulf), Inc. were made defendants, and the M/T JO LONN, her engines, tackle, apparel, furniture, etc. *in rem,* which defendants are collectively referred to as the "M/T JO LONN") was moored, at an excessive speed, having an unusual swell or wake, and causing a violent movement of the moored M/T JO LONN which, in turn, caused damage to the dock; the defendant, M/T ESSO MEXICO, claims that any damage was occasioned in part because of the deteriorated condition of the Petro United mooring dolphin No. 2 and the manner in which the M/T JO LONN was moored; the M/T JO LONN also joins with Petro United, claiming that the damage was caused by the excessive speed of the M/T ESSO MEXICO and further that the deteriorated condition of Petro United's mooring dolphin No. 2 was a cause of the damage. Having considered the evidence, the parties' memoranda, and the applicable law, the Court rules as follows. The Court for reasons which will hereinafter be set out in detail has determined that the fault of all parties contributed to the damages sustained by Petro United and the M/T JO LONN and, therefore, these damages must be apportioned in accordance with *U.S. v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

## FACTS

Petro United Terminals, Inc. is a public storage facility for certain liquid bulk products such as caustic soda. The Petro United dock is located at Mile 203.9 on the eastbank or left descending bank of the Mississippi River. The shoreline structure is comprised of a T–Head with breasting and mooring dolphins situated upstream and downstream, with the seven dolphin platforms connected by a catwalk and with the main catwalk leading inshore from the T–Head platform, dolphin No. 4. This dock facility was originally constructed in 1977, and at that time dolphin No. 2 (the "fire pump dolphin") was utilized as a breasting dolphin and had sustained damage to its old fender system and structure in both 1982 and 1984. The facility was subsequently rebuilt and the new dolphin Nos. 3 and 5 were installed as the breasting dolphins, utilizing a shock-absorbing fender system which places them riverward from the shore an additional ten feet beyond the plane of the regular mooring dolphins. Dolphin No. 2, therefore, with its fender system now completely removed, served only as a mooring dolphin up until the time of the current casualty. Approximately 104 vessels had already berthed at this facility without incident, but it was apparent from the evidence and expert testimony presented at trial that the No. 2 dolphin had been improperly constructed. The lower length of the upstream rear piling was constructed of $\frac{1}{4}''$ wall thickness for 30–inch diameter pipe. Each piling was butt welded, above the water line, to a 30–inch diameter pipe piling with $\frac{3}{8}''$ wall thickness, but the welds joining these pilings were improperly made. There was no backing bar inside the pipe at the butt weld, and the welds did not achieve full penetration.[1] In addition, the pilings had significant preexisting damage, which damage had been inadequately repaired. The four pilings comprising dolphin No. 2 were joined at the top by a steel deck (the platform), which was fitted with two bollards at the river-side corners. These bollards were intended as mooring line attachment

---

1. Not only did plaintiff's civil engineering expert, Clovis Morrison, testify quite candidly as to the inadequacy of the butt welds of the No. 2 dolphin in its initial construction, but concurred in the opinion that there was no possible explanation for why anyone would have joined $\frac{1}{4}''$ steel wall construction onto a base of $\frac{3}{8}''$ steel wall construction, though he believed the structure was fit for its intended purpose as a mooring dolphin.

points and were secured to the steel deck by four one-inch diameter steel bolts. All the maritime and engineering experts who appeared before the Court had never heard of an instance where the dolphin structure itself had failed before either the lines, bollards or bits had snapped or sheared from the platform.[2]

The M/T JO LONN is a Dutch flag tanker constructed in 1982. Her dimensions are 574 feet in length, 105 feet in breadth, with tonnages of 21,568 gross, 14,409 net, and 39,273 dead weight. On December 7, 1987, at approximately 8:00 p.m., the M/T JO LONN docked for the loading of caustic soda and was secured starboard side using 14 lines, all polypropylene and of 8″ circumference. The loading commenced at approximately 9:40 p.m. that night into cargo tanks No. 4 center port and No. 4 center starboard. No complaints were made at that time about the way JO LONN was secured to the berth. The 14 mooring lines consisted of two head lines leading to the farthest upstream mooring dolphin No. 1, two breast lines leading from her foc'sle head to the upstream bollard on the No. 2 dolphin, two forward lines leading from the main deck to the downstream bollard on the No. 2 dolphin, two spring lines from the foc'sle head to the No. 3 dolphin, two after spring lines from the fantail to the No. 6 dolphin, and four stern lines to the downstreammost mooring dolphin No. 7. There were no aft breast lines secured, and this breasting function was assumed to be cured by the placement of the four stern lines to dolphin No. 7, the portmost of which from the stern would best provide this function.[3]

The M/T ESSO MEXICO is a Liberian flag tanker constructed in 1982. Her dimensions are 805 feet in length, 130 feet in breadth, with tonnages of 45,799 gross, 32,589 net, and 87,179 dead weight. The ESSO MEXICO had offloaded her cargo in Baton Rouge and was empty on the evening of December 7 and morning of December 8, 1987, with drafts of 4.4 meters (14′5″) forward and 8.6 meters (28′2″) aft. The ESSO MEXICO got underway from the Exxon Baton Rouge Terminal at 0240, with Captain Pablo S. Bosch on the bridge, along with New Orleans–Baton Rouge Pilot Robert Streckfus [NOBRA 64], and the normal complement of crew navigating the vessel. The Mississippi River stage was at 11.7 feet on the Baton Rouge Gauge yielding a current of approximately 3 statute miles per hour.

The ESSO MEXICO was operated at varying speeds downriver, depending on the traffic. At 0440, the ESSO MEXICO was approximately one mile above the Petro United Terminal at Mile 205. At that time, Pilot Streckfus testified that the ESSO MEXICO reduced speed from 65–70 rpms, or over fifteen miles per hour with the current, to 50–55 rpms, or about 13 miles per hour with the current, this being done because the ship was approaching a moored vessel at the Petro United Terminal. Pilot Streckfus testified that this was the speed at which the ESSO MEXICO passed the JO LONN. Pilot Streckfus further testified that he intentionally steered the ESSO MEXICO farther away from the Petro United dock than is normal, and that this was possible because of the ship's light draft and his personal knowledge of the River. Contemporaneous radio communications indicated complaints of the ESSO MEXICO's excessive speed while proceeding downriver. The Vessel Traffic System Tape, Channel 67, reveals the following transmission:

**2.** Defendant's civil engineering expert, James P. Ewin, opined that the dolphin was in such bad condition that physical calculations normally employed to measure the pressures which such structures can withstand were inapplicable, and that "it would be a fiction to even attempt an analysis of a structure containing defects in construction of this magnitude."

**3.** Defendant's navigation and seamanship expert, Sheldon Held, former Captain in the Corps of Engineers, testified not only that he would

have employed aft breast lines in this situation, but that it "would be taking a chance, especially on the Mississippi River, to tie up without aft breasting lines," and that the potential line-chafing problem alleged as a reason for not employing aft breast lines in this case, due to the height of the dock over and above the JO LONN's deck, appeared to be remedied by the existence of a steel rail at the base of Petro United's dock designed to relieve this chafing problem.

| TIME | VESSEL | TRANSMISSION |
|------|--------|--------------|
| 0442:53 | SAM LEBLANC | "SAM LEBLANC to Nobra 66." |
| 0443:10 | SAM LEBLANC | "SAM to Nobra 66." |
| 0443:57 | (?) | "South bound ship past Georgia Gulf [Georgia Gulf is upstream a short distance from the Petro Dock] ... Captain ... if you had to ride this rough sh_t you're puttin out here ... you slow that damn thing down a little bit." |
| | 64 [ESSO MEXICO] | "64 back ... say again." |
| | (?) | "If you was over here trying to get a barge in the dock ... you slow that damn thing down when you pass here ... over." |
| | 64 | "Roger ... Cap ..." |
| | (?) | "Hey ... he's going to fire ... What's the matter with you ... Are you crazy?" |
| | (?) | "... I am right here trying to get this barge to the dock ... over." |
| | 64 | "Roger ... Roger ... Sorry about that but ... going on." |
| | (?) | "... going to fire. Must be from Texas." |
| | 64 | "We'll slow down next time ... But you're our 1st complaint Cap." |

---

The only ship observed passing the Petro United dock area at this time was a ship heading downriver at an excessive speed. The passing vessel was, by her captain's admission, the M/T ESSO MEXICO. The JO LONN was straining on her moorings in response to the passing of the ESSO MEXICO. Jeff Dudek, a dock operator for Petro United, was startled by loud noises caused by the movement of the JO LONN, which moved backward at its berth and then forward again over a period of minutes. Alarmed by the sudden movement of the ship during loading, Mr. Dudek shut down the valve on the T–Head platform, stopping the flow of caustic soda to the JO LONN, and proceeded to move inland from the dock structure. It was while moving inland on the main catwalk that Mr. Dudek stopped, looked behind the JO LONN, and saw what was the ESSO MEXICO moving downriver of the facility. At 0445 hours, Henricus Smulders, the third officer aboard the JO LONN, was with the chief officer in the cargo control room of the JO LONN. Both heard noises and Mr. Smulders proceeded to the portside main deck, where he noted the stern of a large downbound ship abaft the JO LONN's port quarter. During the JO LONN's movement, the portmost stern line—which was being relied upon to compensate for the absence of aft breasting lines altogether—snapped. As a result of the surging caused by ESSO MEXICO's excessive speed, and the JO LONN's breadth of movement following the parting of the portmost stern line, the No. 2 dolphin was almost completely torn from its butt welds and pulled outboard by the four polypropylene lines acting on the mooring bollards from the main deck and foc'sle deck of the JO LONN. Significantly, the mooring lines attached to the bollards, each secured to the No. 2 dolphin by four one-inch bolts, did not break free. Instead, the whole dolphin was torn outboard in a counterclockwise direction by the four lines. JO LONN's four 8″ mooring lines, and even the one-inch bolts securing the bollards to the dolphin, proved stronger than the dolphin itself. After the movement of the JO LONN settled, the crew of the JO LONN succeeded in re-securing the vessel at its berth. Reloading of the JO LONN resumed at approximately 0520

hours. A portion of the parted portmost stern line of the M/T JO LONN was preserved by Petro United. The parted line showed excessive wear and was unsuited for its intended purpose.[4] As a result of the unusual wake and river suction caused by the passing of the ESSO MEXICO, and the resulting movement of the JO LONN's stern following the parting of her portmost stern line, extensive damage to dolphin No. 2 and the catwalk system at this facility was incurred. The only damage to the JO LONN was to her gangplank running from her deck upward to the T-Head platform. The parties stipulated the damages to the gangplank at $1,000.

At all material times, Petro United was insured by Insurance Company of North America. As a result of the incident, damages were paid by Insurance of North America in the amount of $196,519.57, with a $25,000.00 deductible paid by its assured. There is no dispute that the total damages to Petro United's facility amounted to $221,514.57, but that this figure includes betterment and does not account for depreciation. The parties stipulated that the correct depreciation figure was 22 per cent, arrived at by dividing the 10–years in which this dolphin was in service by its expected 45–year life span, yielding a total stipulated damage figure of $172,781.37 for Petro United.

## CONCLUSIONS OF LAW

This case arises under the Court's Admiralty and Maritime Jurisdiction, Rule 9(h) of the Federal Rules of Civil Procedure, for an alleged tort committed on navigable waters of the United States involving subject matter with a maritime nexus. 28 U.S.C. § 1333.

 In this type of maritime case, the degree of fault of each party is determined by the proportionate liability of the parties for the casualties incurred. *United States v. Reliable Transfer Company*, 421 U.S.

397, 411, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975). The duty of a passing vessel is well established, and a vessel such as the ESSO MEXICO, passing a dock where another vessel is secured, is obligated to proceed carefully and prudently so as to avoid creating unusual swell, wash or suction which could damage a vessel properly moored or any dock facility along the shoreline. *West India Fruit and S.S. Company v. Raymond*, 1951 A.M.C. 1648, 190 F.2d 673, 674 (5th Cir.1951); *Alamaia v. Chevron Transportation Corporation*, 660 F.Supp. 1123, 1127 (S.D.Miss.1987); *New Orleans Steamboat Company v. M/T HELLESPONT GLORY*, 562 F.Supp. 391, 392 (E.D.La.1983); *Shell Pipeline Corporation v. M/T CYS ALLIANCE*, 1982 A.M.C. 389, 395 (E.D.La.1981) (quoting *O'Donnell Transportation Company v. M/V MARYLAND TRADER*, 228 F.Supp. 903 (S.D.N.Y.1963)). The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water, and must take precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage. *West India Fruit and S.S. Company, supra; Alamaia, supra; New Orleans Steamboat Company, supra; Shell Pipeline Corporation, supra*. Furthermore, the safe speed rule, violated by the ESSO MEXICO, is a statutory rule. 33 U.S.C. § 2001(a), 2006. When there is a violation of a statutory rule, the burden shifts to the vessel (ESSO MEXICO) to prove that its fault was not the sole cause of the accident. *The Steamship Pennsylvania v. Troop*, 86 U.S. (19 Wall) 125, 136, 22 L.Ed. 148 (1874); *Alamaia, supra*. The *Pennsylvania* rule shifts the burden of proof as to causation to the statutory offender and, though a difficult burden to carry, the ESSO MEXICO has shown that it was not the sole cause of the losses incurred in this case.

---

**4.** Plaintiff's expert from Marine Inspection Services, Inc., John Mundy, testified that the line itself was so worn generally that it was unfit for service at all. Mr. Smulders testified that all the lines used by JO LONN were identical to the new, orange colored lines running from the foc'sle head to the destroyed dolphin, but review of the photographic evidence of the lines running from the stern of the JO LONN taken a few hours after the casualty convinces the Court that the line tendered in evidence was in fact the portmost stern line that parted.

■ This case presents the unusual situation of a four-pile, steel dolphin structure failing as the result of being pulled by four polypropylene ship's lines. Those four lines were attached to two bollards on the fire pump dolphin. Those bollards were attached to the fire pump dolphin by a total of eight, one-inch diameter steel bolts, four per bollard. The ship's four polypropylene lines were stronger than four interconnected 30-inch diameter steel pipe pilings. In fact, the eight bolts holding the bollards to the dolphin were stronger than four 30-inch steel pipe pilings. This leads to the inescapable conclusion, as supported by the experts in this matter, of either improper construction, improper maintenance, or prior damage to the four-piling dolphin structure. The failure of the mooring facility, in the circumstances before this Court, creates a presumption of negligence against Petro United in the manner of the structure's construction or its maintenance. *Board of Commissioners v. M/V GIBRALTAR PANSY,* 1977 A.M.C. 878, 886 and fn. 12 (E.D.La.1977). Beyond the mere presumption of fault, however, is the specific evidence of inadequate construction, maintenance, and repair of Petro United's fire pump dolphin. The Court finds that the dilapidated and defective condition of the dolphin structure was a substantial cause of its destruction in this incident.

■ In addition, the proper mooring of a vessel is the responsibility of the vessel and her master, not the dock owner, although the dock owner itself is required to keep its facility in proper condition. *Shell Pipeline Corporation, supra.* The JO LONN has failed to show that it was not in her power to prevent the damages that occurred herein by having adopted the reasonable and practical precautions of employing aft breasting lines and maintaining all its lines at proper tautness during the loading of the ship, *New Orleans Steamboat Company, supra; Creole Shipping, Ltd. v. Diamandis Pateras, Ltd., et al.,* 410 F.Supp. 313, 317–18 (S.D.Ala.1976), and the Court finds that the JO LONN must also be held at fault in this incident for improper mooring, poor condition of mooring lines, and slack mooring lines which could have prevented her stern from swinging riverward to place her full forces upon the No. 2 dolphin alone. Over one hundred vessels had already berthed at this facility without incident, and the failure to have employed aft breasting lines in accordance with accepted practice or to have tightened her stern lines during the loading of the forward portion of the ship contributed to the losses incurred.

■ The Court, having determined that the fault of all parties contributed to the damages sustained by Petro United Terminals, Inc. and the M/T JO LONN, finds that it must apportion these damages in accordance with *U.S. v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The Court further finds that it is appropriate for it to exercise its discretion to decline the award of prejudgment interest pursuant to the line of decisions from *Kawasaki Zosensho v. Cosulich Societa Triestina Di Navigazione,* 11 F.2d 836 (5th Cir.1926)(general rule of prejudgment interest does not apply when inequitable; where claims are unliquidated and seriously and in good faith insisted upon and opposed) to *American Zinc Co. v. Foster,* 441 F.2d 1100 (5th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971)(peculiar circumstances usually considered to justify disallowance of prejudgment interest are delay in bringing suit to trial and seriousness of the dispute as to liability)[5] for the following "peculiar reasons:" First, the plaintiff delayed bringing this matter to trial, as the casualty occurred on December 8, 1987 but plaintiff did not initiate suit until Septem-

---

**5.** The cases applying the equitable "peculiar circumstances" test include *Chitty v. M/V Valley Voyager,* 408 F.2d 1354 (5th Cir.1969) (mutual fault collision is a circumstance where award of prejudgment interest may be declined) and *Sinclair Refining Co. v. The S/S Green Island,* 426 F.2d 260 (5th Cir.1970) (delay in prosecution, along with other facts and circumstances, are the factors to be considered when determining the existence of "peculiar circumstances" that will authorize the exercise of discretion to award less than full compensation by denying interest).

ber 29, 1989; further, plaintiff moved for a continuance of the trial on August 27, 1990, four days after the pre-trial conference in this matter and three days before the trial date, which motion was granted. Second, the respective fault of the parties was never clearly defined at any date; the claims were unliquidated, uncertain and opposed in good faith in both law and fact. Third, the plaintiff in all pleadings and settlement discussions claimed substantially more than the Court awarded and at no time reduced its claim to an amount approximating that awarded by the Court following trial of this matter.

The Court finds that the total damages sustained were as follows:

Plaintiff, Petro United
Terminals, Inc. $172,781.37
M/T JO LONN $ 1,000.00

and that these damages should be apportioned as follows: Fifty percent due to the fault of the M/T ESSO MEXICO. The other fifty percent resulted from the combined fault of the plaintiff Petro United Terminals, Inc. and the M/T JO LONN in the following proportions: Forty percent is attributable to Petro United Terminals, Inc. and ten percent is attributable to the M/T JO LONN. Accordingly,

The Clerk of Court is directed to enter a judgment herein in favor of Petro United Terminals, Inc. and against the M/T ESSO MEXICO in the sum of $86,390.68 and against the M/T JO LONN in the sum of $17,278.14.

The Clerk of Court is further directed to enter a judgment against the M/T ESSO MEXICO in favor of the M/T JO LONN in the sum of $500.00 and against Petro United Terminals, Inc. in the sum of $400.00.

The Clerk of Court is further directed to enter a judgment in accordance herewith to provide that costs of these proceedings shall be borne by the parties in accordance with their respective fault and with legal interest from the date of entry of judgment until paid.